UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID SCOTT and JEREMY CERDA, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> -*against*- <br><br> WARDEN HERMAN E. QUAY, <br><br> Defendant. | No. 19 Civ. 1075 <br><br> **CLASS ACTION COMPLAINT AND JURY DEMAND** |

David Scott and Jeremy Cerda, on behalf of themselves and others similarly situated, and by and through their attorneys, Emery Celli Brinckerhoff & Abady LLP, allege as follows for their complaint:

## PRELIMINARY STATEMENT

1.      Wardens must provide the people in their jails with a minimal civilized measure of life's necessities—adequate safety, food, warmth, exercise, hygiene, and medical care. These are some of the most basic conditions of confinement the Constitution requires. These standards define a civilized society. While jails need not be comfortable, they must provide decent, humane conditions for the people who live there.

2.      This case concerns a humanitarian crisis that unfolded in Brooklyn's federal jail, the Metropolitan Detention Center ("MDC"), during the bitterly cold week of January 27, 2019 to February 3, 2019. The crisis is remarkable both because of how obvious it was in the making and how little was done about it once it happened. The general failings of MDC's infrastructure and management were widespread and obvious for years before; problems with the heating and electrical systems in particular were erupting throughout January 2019. And when the expected

1

happened, MDC's Warden, Defendant Herman Quay, engaged in a shocking dereliction of his obligation to provide these most basic minimal living standards to more than a thousand people in his care and custody.

3.     Following an electrical fire, the West Building of the MDC was without normal electricity beginning on January 27, 2019. In the seven-day period that followed, the men detained in the MDC West Building, the majority of whom were in custody awaiting their trials, were subjected to inhumane conditions that posed unreasonable and substantial risks to their health and safety.

4.     For more than a week, MDC's cells remained dark and cold. People were confined in near pitch-black darkness. People sat shivering in their beds, huddled under blankets with little or no heat in the cells.

5.     The lack of light and heat was compounded by an array of other of brutal conditions. People were confined to their cells continuously for days. Hot showers and hot water were suspended or severely limited. Cells with toilets that were not functioning were filled with the smell of decaying feces. People continued to live in their soiled clothing and bedsheets without any laundry. Requests for medical and psychiatric care were ignored. People had no access to regular or hot food. Communication with the outside world—whether by email, phone or visits from lawyers or family—ceased. People struggled to maintain their sanity in a void of information about when the blackout would end. And of course, jail employees were forced to work under these impossible circumstances.

6.     These horrifying conditions, independently and through their mutually reinforcing effects, produced a serious deprivation of basic human needs for the people confined in MDC.

7.     Warden Quay knew about the problems with MDC's infrastructure well before this particular crisis and he knew about the crisis when it happened. He was aware of the appalling conditions at MDC in real time, as each hour of the crisis unfolded, yet he failed to make reasonable efforts to remedy those conditions. He acted with a complete disregard for the humanity of the people who were being held in the jail, and for the people who were working in the jail. He did not provide people with additional blankets or clothing. He did not seek assistance from Con Edison or FEMA in obtaining backup power sources. He did not take any measures to protect the sick, the elderly or the disabled, who were most immediately vulnerable to harm. Instead, Warden Quay locked the more than one thousand people in the jail in their cells, and he left them to freeze in short-sleeved, cotton jumpsuits, in the dark as a polar vortex blasted New York City.

8.     Mr. Scott and Mr. Cerda, two former MDC detainees, bring this action for damages on behalf of themselves and all other people subjected to these conditions to redress Defendant's violation of their rights under the Fifth and Eighth Amendments of the Constitution of the United States pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

**PARTIES**

9.     Plaintiff DAVID SCOTT is a citizen of the United States and a 60-year-old man who resides in Queens County, New York. At all times relevant to this Complaint, Mr. Scott was in the custody of the Federal Bureau of Prisons ("BOP") at the Metropolitan Detention Center located in Brooklyn, New York. Mr. Scott was released from MDC, and BOP custody, on February 20, 2019.

10.     Plaintiff JEREMY CERDA is a citizen of the United States and a 25-year-old man who resides in Queens County, New York. At all times relevant to this Complaint, Mr.

Cerda was in the custody of the BOP at the Metropolitan Detention Center located in Brooklyn, New York. Mr. Cerda was released from MDC, and BOP custody, on February 5, 2019.

11.     Mr. Scott and Mr. Cerda sue for compensatory and punitive damages on behalf of themselves and all other members of the Plaintiff class who are similarly situated.

12.     Defendant HERMAN E. QUAY, Warden of MDC, was at all times relevant to this Complaint acting within the scope and course of his employment with the BOP. As Warden of MDC, Defendant Quay is responsible for and oversees all day-to-day activity at MDC. He is responsible for all aspects of the operation and function of MDC. His responsibilities include ensuring the safety of all in the institution and ensuring the orderly running of the institution. Approximately 1,600 men live in MDC's West Building. Defendant Quay knew that power and heat problems were foreseeable at MDC, he was personally aware of the conditions described below at all times relevant to the Complaint, and he failed to take adequate steps to prevent these conditions or alleviate them when they occurred. He is sued in his individual capacity.

## JURISDICTION AND VENUE

13.     This action arises under the Fifth and Eighth Amendment to the United States Constitution.

14.     This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331.

15.     Venue in this case is based upon 28 U.S.C. § 1391(b)(2). The Eastern District of New York is the proper venue because it is the judicial district wherein a substantial part of the events and omissions giving rise to this action occurred.

## STATEMENT OF FACTS

16.     From January 27, 2019 to February 3, 2019, MDC was plunged into darkness and cold ("the Conditions Crisis"). David Scott, Jeremy Cerda, and more than a thousand other class members at MDC were subjected to unconstitutional and inhumane conditions. Warden Quay

4

was warned of systemic problems at MDC before the Conditions Crisis, he had notice of these horrific conditions during the crisis, and he failed to remedy them.

**I.      Warden Quay's Knowledge of MDC's Longstanding Infrastructure Failures**

17.     Warden Quay knew what was coming: MDC's problems were widespread and well known. Former MDC Warden Cameron Lindsay has said that over the last ten years, "the M.D.C. was one of the most troubled, if not the most troubled, facility in the Bureau of Prisons." In a hearing after the crisis, Judge Nicholas Garaufis remarked that the jail's physical state had been deteriorating for years.

18.     Among many issues plaguing the jail for years, including the flagging physical plant and mismanagement, MDC has long suffered from inadequate heat and a failing infrastructure. People detained at MDC have long complained about the cold temperatures at the jail.

19.     In addition to the general concern about MDC's infrastructure, Warden Quay was aware of specific warning signs concerning the jail's electricity and heat during the weeks leading up to the Conditions Crisis. He also was aware that the MDC's power and heat problems had serious spillover effects on critical aspects of jail functioning such as attorney visitation.

20.     On information and belief, there were three blackouts in January 2019 before the Conditions Crisis during which MDC lost power for a day or more.

21.     For example, on January 4, 2019, MDC management and staff informed Warden Quay that the West Building had experienced a partial power outage and was operating on emergency lighting in numerous areas. The facilities staff informed him that the power outage likely would not be repaired until the next day.

22.     Warden Quay would later state under oath that he knew a power outage of this scale significantly impacts the safe and orderly operation of the institution. For example, he understood that the emergency lighting in the West visiting room was "intermittent, dim, and could result in certain areas of near total darkness." Warden Quay cancelled attorney visits until the electricity could be restored.

23.     MDC did not remedy the January 4 blackout until the evening of January 5, 2019. Attorney visits were not reinstated until January 6, 2019.

24.     In addition to electrical issues, John Maffeo, MDC's facility manager, has testified that MDC suffered heating issues beginning in and around the week of January 13-20, 2019.

25.     On information and belief, Maffeo refused to let electricians into the related area, handled it personally, and refused to let anyone else assist him.

26.     Union President Anthony Sanon, the chief of the correction officers' union, stated that he "reported to his superiors in mid-January" that, as a result of "problems with cold," "corrections officers were wearing scarves, coats and hats on duty."

27.     Multiple detainees have reported that MDC was without heat in some areas from January 19, 2019 onward.

28.     Warden Quay and his staff assured Sanon they would monitor the heat. Sanon later described the Warden's response to the crisis as superficial: "They were trying to sugarcoat it."

29.     By the third week in January, the heating issues persisted. Hai June Bencebi, another MDC employee, said it became "extremely cold" at MDC around January 19, 2019.

30.     The problems with MDC's heating and electricity came to a head on Sunday, January 27, 2019.

31.     Con Edison would later attribute the power outage on January 27, 2019 to the failure to remedy preexisting problems at the jail. Instead of fixing the problem, MDC had put more demands for more power on a weaker system.

## II.     The Conditions Crisis: Sunday, January 27, 2019 to Sunday, February 3, 2019

32.     At midday on January 27, 2019, MDC experienced a partial power outage when an electrical panel caught fire in the jail's control room.

33.     After the electrical panel failed, the jail lost electricity and switched to emergency power for the operation of the jail's emergency functions.

34.     As corrections officers acknowledged, the blackout created a dangerous situation inside the MDC.

35.     In addition to losing light—while New York City was gripped in what meteorologists were calling the "Polar Vortex," record-breaking cold for the winter —MDC had little or no heat in the cells of the housing units.

## III.     The Unconstitutional and Inhumane Conditions of Confinement Experienced by Named Plaintiff David Scott During the Conditions Crisis

36.     On Sunday, January 27, 2019, Mr. Scott was in the recreation area at MDC when the lights suddenly went out. Mr. Scott was caught off-guard by the electricity failure. Jail staff ordered that everyone immediately lock-in to their cells.

37.     David Scott is 60 years old. He was born in 1959 and raised in Queens, New York.

38.     Mr. Scott has worked for the past several years as a call center operator, assisting people calling to schedule rides for the Access-A-Ride program.

7

39.     Mr. Scott had first arrived at MDC on January 10, 2019 to await his trial.

40.     After his admission, Mr. Scott spent approximately one week in the Intake Unit, Unit 41. He was then transferred to Unit 61, where he remained until his release from MDC on February 20, 2019.

41.     On January 27, 2019, he was ordered into his cell in the midst of the power outage.

42.     The next day, Monday, January 28, 2019, it became noticeably colder in the already-cold unit. Mr. Scott had no heat in his cell. The air vents in Mr. Scott's cell were blowing cold air.

43.     Some MDC staff on the unit wore coats, hats and extra layers over their uniforms.

44.     Mr. Scott's clothes consisted of one cotton short-sleeved jumpsuit, undershirts, underwear, and socks. He had no long-sleeved shirt or warm layers.

45.     Mr. Scott was never offered or provided additional clothing or blankets.

46.     Mr. Scott had only two thin blankets that he was given when he arrived at MDC.

47.     Mr. Scott wrapped himself in a blanket, but the frigid temperatures made it impossible to stay warm.

48.     Beginning on January 27, 2019, Mr. Scott was locked in his cell for 24 hours a day for several days. Eventually, he was permitted to leave his cell for brief periods of time, but he spent most of his time during the Conditions Crisis locked alone in his freezing cell.

49.     Because there was no light in the cell, Mr. Scott could not read. He ate meals in the dark and could not see his own food.

50.     Mr. Scott had no access to email, phone calls, or television during the Conditions Crisis, other than the brief periods when he was permitted out of his cell and the Federal Defender phone line was available.

51.     One officer told Mr. Scott that it could take several weeks or a month for power to come back on.

52.     Mr. Scott received meals later than the normal mealtimes and the food was often cold. Mr. Scott was constantly hungry throughout the Conditions Crisis.

53.     He was unable to purchase food or clothing from the Commissary during the Conditions Crisis.

54.     Mr. Scott spent most of the week lying under his covers huddling to stay warm. On occasion he would try to do push-ups to stay warm.

55.     Mr. Scott had no access to hot water during the Conditions Crisis. He cleaned himself in his cell sink and took two cold showers.

56.     Mr. Scott wore the same clothes for a week and rotated amongst three pairs of underwear.

57.     Mr. Scott could not communicate with his family or girlfriend during the Conditions Crisis. When his girlfriend attempted to visit him on January 28, 2019, MDC staff turned her away and told her that visiting was suspended due to the blackout.

58.     Mr. Scott was not able to receive counsel visits during the Conditions Crisis.

59.     The living environment on Unit 61 was loud and hostile. People were banging on their cells in frustration that MDC staff had locked the unit into their cells and that no information was being provided to them about anything.

60.     On several occasions, MDC officers arrived on the unit in a show of force, wearing full riot gear, including helmets and weapons, and ordered the unit to lock-in.

61.     Mr. Scott learned that one detainee on the unit had suffered a seizure but had received no medical care even when the emergency button in his cell was pushed.

62.     Mr. Scott observed that there seemed to be little staff on the unit and it often felt abandoned. This was terrifying to Mr. Scott because of the prospect that he would be locked in his cell without help nearby in the event of a further emergency.

63.     Without legal or social visits, phone calls, commissary access, and locked alone in his cell with no foreseeable end to the situation, Mr. Scott felt isolated and afraid.

64.     Mr. Scott felt claustrophobic in his cell. He tried to keep his mind occupied by thinking about his family, including his parents who both passed away in 2018.

65.     Before the blackout, Mr. Scott was scheduled to receive an x-ray for numbness in his hands. He also had developed a skin fungus which required topical treatments, and he was taking antibiotics to treat an abscess under his armpit.

66.     Mr. Scott requested medical care relating to these conditions on several occasions during the Conditions Crisis, but his requests were ignored.

67.     Later in the week, Mr. Scott saw the protestors outside the jail protesting the conditions, on his behalf. He realized that the world had not forgotten about him and the other detainees. He was moved by the fact that the outside world was paying attention and cared.

68.     On Friday, February 1, 2019, Mr. Scott appeared in this Court with his lawyer, Ashley Burrell from the Federal Defenders Office.

69.     Mr. Scott's lawyer reported to the Court that conditions were dire at MDC, specifically reporting that Mr. Scott had been without heat or electricity since January 27, 2019,

10

that he had not received necessary medical care, and that he had been sitting in the dark in his cell for days in the brutal cold. She expressed concern to the Court about the impact of these conditions on Mr. Scott given his age.

70.     In response, the Court directed on February 1, 2019 that Mr. Scott receive medical attention to address his requests for renewed antibiotics for the abscess, and x-rays and medical attention to diagnose the numbness in his left arm and hand.

71.     On February 4, 2019, Mr. Scott finally was seen by a Nurse Practitioner at MDC in response to the Court's Order.

72.     On Saturday, February 2, 2019, Mr. Scott was locked in his cell all day. "Lunch" was served at 5:30pm.

73.     On Sunday, February 3, 2019, power was restored to Mr. Scott's cell. Mr. Scott's unit was then locked-in to their cells for the evening without explanation.

74.     Mr. Scott was released from custody on bail on February 20, 2019.

**IV.     The Unconstitutional and Inhumane Conditions of Confinement Experienced by Named Plaintiff Jeremy Cerda During the Conditions Crisis**

75.     On Sunday, January 27, 2019, Mr. Cerda woke up and discovered the lights were out in his cell in the West Building of MDC. In some common areas, there were a few lights, but the cells themselves were completely unlit.

76.     Jeremy Cerda is 25 years old. He was born in 1993 in Queens, New York. He lives with his mother and his younger sister.

77.     Mr. Cerda grew up in Queens and has a GED. He has worked at different jobs, including retail and as a delivery driver. He has a two-year-old daughter.

78.     Mr. Cerda suffers from major depression and anxiety.

79.     On January 25, 2019, Mr. Cerda returned to Court to address a potential violation of the terms of a bond. The Court ordered that Mr. Cerda be remanded from the courthouse directly to MDC for his failure to obtain employment, a condition of his bond.

80.     On the afternoon of January 25, 2019, Mr. Cerda was placed in the intake unit (Unit 41) at MDC. He remained on Unit 41 during his entire confinement at MDC.

81.     Prior to his admission to MDC, on Friday, January 25, 2019, Mr. Cerda had been incarcerated on one prior occasion, for approximately one week at MDC in 2015.

82.     Two days after he was admitted to MDC, the lights went out. In the following seven days, Mr. Cerda received some natural light in his cell in the daytime, but in the evening and night, his cell was pitch black.

83.     At the start of the Conditions Crisis, Mr. Cerda began to feel extremely cold. There was little or no heat in the cell. The cell was freezing due to the sub-zero temperatures outside.

84.     On Sunday, January 27, 2019, the high temperature outside was 45 degrees Fahrenheit; the low was 28 degrees.

85.     Mr. Cerda's cellmate attempted to cover the air vent of the cell with paper to keep heat in the cell.

86.     At the time, Mr. Cerda only had a cotton short-sleeved t-shirt, a cotton short-sleeved jumpsuit, socks, and slide-on shoes. He had four blankets and no sheets: two thinner blankets that were used as bottom sheets to cover the bare mattress (no sheets had been provided to him by MDC) and two blankets to cover himself with.

87.     Mr. Cerda could not purchase any warm clothes or thermals because the commissary was not open.

88.     From Monday January 28 to Thursday January 31, the daily high temperatures outside were 39, 43, 35, and 17 degrees, respectively. The daily low temperatures were 23, 23, 7, and 3 degrees.

89.     Mr. Cerda received no clean clothes or bedding during the Conditions Crisis.

90.     To try to stay warm, Mr. Cerda wrapped himself in the two blankets and spent his time either sleeping or lying in bed.

91.     Mr. Cerda received no explanation for the failure of the heat and electricity. Correction officers told people on his unit that they did not know when either the heat or light would be back on, and that the outage could last as long as a month.

92.     Beginning on Sunday, January 27, 2019, and for approximately seven days, Mr. Cerda was locked in his cell for extended periods. On a few occasions during the next week, Mr. Cerda was allowed out of his cell to sit in a common area for a short period of time.

93.     The only contact that Mr. Cerda had with jail staff was when a guard came to give Mr. Cerda his meals.

94.     Mr. Cerda ate most of his meals in the cell during this seven-day period, often in the dark so that he was not able to see what he was eating.

95.     The meals were served at random and unpredictable times, and often came hours after they were supposed to—breakfast, for example, was served in the afternoon one day.

96.     The water that came out of the tap in Mr. Cerda's cell was brown and discolored. Mr. Cerda had to drink the cell water and was not given any other drinking water.

97.     The toilet in Mr. Cerda's cell was not functioning properly and could only be flushed intermittently.

98.     Other than serving meals and doing the count, Mr. Cerda did not see any jail staff. No one ever came to his cell to check on him.

99.     During the Conditions Crisis, Warden Quay walked through the unit with a group of other people. The Unit was still on lockdown, but people were released from their cells during the Warden's tour. Some people were wrapped in blankets as they stood outside their cells during the Warden's tour. The cells were freezing cold and without light.

100.    Late in the week, Mr. Cerda saw people protesting in the parking lot outside the jail. Mr. Cerda was happy to see the protestors because he thought that no one on the outside knew what was happening.

101.    Mr. Cerda did not have any heat at all in his cell for approximately five days.

102.    Mr. Cerda was not permitted or able to communicate with his lawyer or family members between January 27 and February 3. He had no access to phone calls or mail, or to email via the CorrLinks system. Mr. Cerda's mother and lawyer were not able to visit him.

103.    On one occasion between January 27 and February 3, Mr. Cerda attempted to contact his lawyer on the Federal Defender's dedicated phone, but he could not reach her because she does not work for the Federal Defenders.

104.    Mr. Cerda was only permitted to take two showers between January 27 and February 3, both of which were cold.

105.    Mr. Cerda was disturbed by the constant noise and banging on the unit between January 27 and February 3. Other people on the unit were screaming and crying. People were begging the guards to let them out of the lockdown. Some were fainting and experiencing medical problems.

106.    On or about February 1, 2019, Mr. Cerda began to think about hurting himself. He could no longer tolerate being locked in the cell for 24 hours a day. He had no idea when the blackout conditions would end. He could not contact anyone and felt scared and alone. Mr. Cerda was worried about his safety.

107.    Although Mr. Cerda needed help, he did not receive nor was he offered any mental health treatment at any point between January 27 and February 3.

108.    On that Friday, February 1, 2019, the high was 22 degrees and the low was 11 degrees.

109.    Mr. Cerda did not receive a physical or mental health screening in connection with his admission to MDC until Friday, February 1, 2019. At that time, he reported to the medical staff that he suffered from depression and anxiety.

110.    On Saturday and Sunday, February 2 and February 3, the high temperature outside was 34 degrees and 53 degrees, respectively. The lows were 16 and 33 degrees.

111.    At Mr. Cerda's next hearing, on February 5, 2019, upon hearing of the conditions at MDC, the Court stated: "no one deserves to live in these conditions, if even half of what has been represented on the record is accurate."

## V.    The Common Unconstitutional and Inhumane Conditions of Confinement at MDC Experienced by the Putative Class Members During the Conditions Crisis

112.    MDC's West Building has the capacity to house approximately 1,600 people.

113.    Media reports, accounts from people in the jail, and publicly-filed documents show that the horrific conditions during the Conditions Crisis were pervasive across the West Building and posed a serious threat to health and safety.

114.    During the Conditions Crisis, class members experienced a number of common conditions of confinement at the MDC West Building.

15

**A.  No Light in the Jail's Cells**

115.    When MDC lost power, the jail was forced to use generator power. But there was no electricity in the cells. Cells had no light and were pitch black by the late afternoon as the only light came from small, obscured cell windows. And even when the sun was up, some cells were completely dark. Common areas such as corridors were irregularly and dimly lighted.

116.    Multiple people have reported the same pervasively dark conditions.

117.    For example, it was so dark that one person was unable to read his Bible in his cell. Another person, who took many different medications, said that it was too dark to see which pill was which and he was afraid to take the wrong medication or quantity.

**B.  No Heat in the Jail's Cells**

118.    During the coldest week of the winter, MDC did not provide heat to the people confined in the West Building. People were not provided with additional blankets or with warm clothes. Frost covered cell windows. People reported suffering from congestion, sore throats, and other medical conditions because of the frigid temperatures.

119.    Multiple people have reported on the same, freezing conditions. For example:

a.  One person stated it was so cold in his cell that the water in his drinking cup froze over.

b.  Even with the weak light coming in through his cell window, another person could see his own breath.

c.  Some people layered themselves with all of the clothing they had in their cells and wrapped towels around their heads and faces to try to stay warm.

    d.   One person found it too cold and uncomfortable to sleep, even with all his clothes on (including two pairs of socks), two blankets, and a book blocking cold air from the vents in his cell.

    e.   Another person reported that he saw correction officers bundled up in jackets, hoodies, and hats, but that he didn't have anything to bundle up with. He tried to stay warm by walking around his cell and wrapping his blanket around himself.

    f.   Another person knew that at one point his cell was 30 to 40 degrees because a correction officer entered his cell, then read and announced the temperature.

    g.   Several people told their attorneys that a correction officer entered their unit with a hand-held thermometer that read 34 degrees.

    h.   On January 31, another person awoke to find a layer of ice (approximately ⅛" to ¼" thick) on the inside of his cell window.

**C.  Other Related Inhumane and Unconstitutional Conditions**

120.    The loss of light and heat were compounded by a cascade of related deteriorations in the conditions of confinement during the Conditions Crisis.

121.    These related conditions included: complete and near-complete lockdown in cells, limited medical care, infrequent showers and limited hot water, no exercise, no clean laundry, no commissary, no hot meals, no access to counsel, no email, and no family visits.

    ***i.  Lockdown in Cells***

122.    People were locked in their cells for most of the day and night for the majority of the Conditions Crisis. People were not allowed to leave their cells for any reason, such as to make phone calls, visit the law library, exercise, or eat meals.

### ii.   No Medical Care

123.   People did not have access to medical staff even for serious medical conditions. They could not fill or refill medical prescriptions or request medical care because the medical computer system was not functioning. People who requested medical care verbally were ignored. People were denied medical appointments and treatment for new and ongoing conditions. People who pressed the emergency buttons in their cells were ignored.

124.   Examples of the common experience of lack of medical care include:

   a.   A person with obstructive sleep apnea was unable to plug in his Continuous Positive Airway Pressure ("CPAP") machine for seven days, making it hard to sleep and causing anxiety. He believed he was one of eight people at MDC with this issue.

   b.   Another person, who suffers from chronic asthma, required daily use of his oxygen mask and inhaler. Throughout his detention, he was denied his oxygen mask and had to rely on the two inhalers in his possession when he was arrested. During the Conditions Crisis, the cold, stagnant air caused him serious breathing problems, including coughing and wheezing fits. He felt like he was repeatedly on the verge of an asthma attack and needed to use his inhaler multiple times a day (though it is not intended to be used that frequently). The repeated use of his inhaler then caused chest pains and lightheadedness. He feared that he would faint, and in the darkness of MDC, staff would not be able to see his collapse.

   c.   A person who takes two anti-seizure pills a day was down to his last three pills on February 1. He was told that the jail could not provide him with a refill because the electronic system that was needed to do so was down.

d.  Another person with glaucoma had high pressure in his eyes and was seeing flashes, an indication that he needed to go to the hospital immediately. His pleas were ignored. He also had bandages for a gunshot wound that had been unchanged for weeks, and his wound was oozing pus.

e.  Two people suffered seizures during the Conditions Crisis and pressed the emergency button for help, but no one came to aid them.

f.  A person pressed the emergency call button on the morning of February 2, and a correction officer simply reset the button without checking on him. The person pressed the button again and was eventually told—much later—that "no medical services are available now."

g.  A person with high blood pressure requested medical attention and that his medication be refilled at least three times. He ran out of his medication on January 28 and it was not refilled until February 5.

### iii.  *Limited Showers and Hot Water*

125.  People were not permitted to shower regularly and there was no or limited hot water.

126.  Multiple people reported the same conditions:

a.  One person said there was "no hot water at all" and he did not shower at all during the Conditions Crisis because "I wasn't going to take a shower in frozen water. It was already cold in the cell."

b.  One person reported that he had "to stink because the shower was freezing cold."

c.  One person stated that he had gone without a hot shower from January 26 to January 31.

    d.   People complained that the tap water in their cells was cold and brackish. The brown, cloudy water from the tap was not drinkable.

    e.   Another person stated, "the (cold) running water that they do have started running red and brown."

    f.   A person reported "[l]ittle or no hot water in showers or cells" and the water that was in the cells was "non-potable," "brown," and "sewage-type."

### iv.   *No Clean Laundry*

127.    People were not provided with clean clothes or clean bedding. Examples of this common experience include:

    a.   People stated that they had not received clean underwear or socks for a week.

    b.   A person had water leaking from the ceiling of his cell onto his bed. His sheets were soaking wet and had not been changed in a week.

    c.   One person with an ulcerative colitis flare was forced to sleep on sheets covered in his own blood.

    d.   Another person with colitis developed a bleeding rash, and when he showed a correction officer his dirty underwear to receive a new pair, the officer told him, "It's above my pay grade."

### v.   *No Commissary*

128.    People could not access the commissary, which was closed because of the limited electricity.

129.    Examples of this common experience include:

    i.   People reported to the Federal Defenders that the commissary was closed and they were therefore unable to buy extra sweatshirts, thermals, or blankets.

j.  Other people had run out of soap and toothpaste but were unable to buy them from the commissary.

### vi.  No Regularly Scheduled, Warm, or Edible Meals

130.  People received cold or tepid meals, at irregular times, often hours later than the normal times, and were often hungry. Sometimes food was restricted to one meal a day. When food did arrive, it was often in inedible condition, having been kept out for many hours before it was served due to the full lockdown. Bagged lunches, such as a bologna sandwich and canned food, were handed out instead of meals.

131.  Examples of loss of regular, hot meals include:

a.  On February 2, one person reported that he did not receive breakfast, received lunch at 4:30 p.m. (the first meal of the day), and received dinner at 8:30 p.m. At approximately 10:20 a.m. that morning, when another person asked a correction officer when they would receive breakfast, he was told "I don't need to explain anything" and "You'll be fed when you're fed."

b.  Another person reported irregular meals: breakfast (supposed to be at 6:30 a.m.) was served at 10:00 a.m., lunch (supposed to be at 11:00 a.m.) was served at 5:00 p.m., and dinner was served at 7:30 p.m. and was cold. They were given the same meals for lunch and dinner.

c.  Another person reported that his unit did not receive hot meals during the blackout and instead had bag lunches with bologna or cheese sandwiches.

d.  One person who kept kosher only received canned sardines to eat.

e.  Another person reported that the food was "undercooked and cold" two days in a row, giving him a bad stomach ache.

f.   The people on one unit reported to their attorney on January 31 (Thursday) that they hadn't received warm food since the previous Sunday.

### vii.   *No Access to Counsel*

132.   People could not contact their lawyers through the normal channels of email (CorrLinks), phone, or mail. Attorney visitation was cancelled. The only functioning phone line was a dedicated line to the Federal Defenders office, which received numerous calls from scared and frantic people during the brief periods they were allowed out of their cells.

133.   Examples of this common experience include:

a.   On January 29, one person tried to acquire the form to request a legal telephone call but was told by correction officers that he would have to wait until Monday (six days later).

b.   Several people had sentencing hearings scheduled the following week and had been unable to speak with their lawyers.

### viii.   *No Family Communication*

134.   Social visits with family members were suspended.

135.   For example, one person's family members were "the only people that ma[de] him] feel comfortable" in jail, and he would "go about [his] day by talking to them." He found it stressful not to be able to contact them.

136.   Another person with diabetes and mental health issues was unable to contact his fiancée during the Conditions Crisis. When their correspondence stopped, she feared he had been sent to the hospital or died.

137.   The above commonly brutal conditions, individually and through their mutually reinforcing effects, posed serious harm to the health and safety of all people who were housed at

MDC's West Building during the Conditions Crisis.

## VI.     Warden Quay Was Personally Involved in Creating and Maintaining the Unconstitutional Conditions of Confinement

138.    The chaos and misery of the Conditions Crisis was entirely foreseeable.

139.    The jail's deteriorating infrastructure was a matter of widespread public knowledge. Warden Quay knew that a power outage was possible at any time.

140.    Warden Quay was aware of repeated problems with heat and light at MDC earlier in January 2019 leading up to the Conditions Crisis.

141.    There were ongoing staffing shortages in the facility.

142.    Warden Quay knew of the power outage on January 27. He has averred that "after learning of the fire that occurred in the MDC on January 27, 2019, my staff reported to me regarding the impact to the institution. By late that same day, I learned that the fire had destroyed the 'Priority 3' power distribution equipment, one of three power distribution systems in the West Building. I was informed by staff that, for the time being, repairs were more feasible and quicker than replacement, and that the repairs would likely take at least a week."

143.    Throughout the Conditions Crisis, Warden Quay has averred, he "continued to assess the operational and security challenges presented by the facility issues on a day-by-day basis."

144.    Warden Quay also testified: "I was informed, for instance, that only essential systems, such as security equipment, fire equipment, health equipment, electrical doors, and emergency lighting systems had power."

145.    In the face of a crippling crisis at MDC, and knowing that the situation could not be remedied for at least a week, Warden Quay failed to take any steps to maintain basic living standards for the people in his charge.

146.     Warden Quay left more than a thousand men isolated in dark and freezing conditions for nearly a week, with limited access to medical care and hot food and water, without attorney or family visitation, and cut off from access to the CorrLinks telephone and email systems.

147.     Warden Quay's failings were legion:

a.   Warden Quay did not activate MDC's emergency plan. Every detention facility has an emergency plan to deal with exigencies, including problems with heating and lighting. "City Councilman Jumaane Williams said there seemed to be no emergency plan [at MDC] and 'no plan to create a plan' when he and other legislators met prison officials last week." On information and belief, Warden Quay was directly asked by the correction officers' Union to activate the MDC Emergency Plan and he refused to do so. Warden Quay did not establish an emergency command center.

b.   Warden Quay's response to the crisis was to order people to be confined to their cold, dark cells.

c.   Warden Quay did not move people with sleep apnea who had prescribed CPAP machines for respiratory support to a part of the facility where the electricity was working (e.g., the medical offices or the East Building), or to another BOP facility with working electricity. For seven days, these men slept without sufficient oxygen. When later asked why he had not done anything to provide a substitute for this critical medical support, Warden Quay claimed that "no one raised the question."

d.   Warden Quay did not take steps toward swift resolution of the electrical problems. For example, on Friday February 1, Rep. Jerrold Nadler announced that he had learned "that contracted electricians had already left, and that power was unlikely to be restored over the weekend."

e.   Warden Quay did not undertake the most basic steps to ameliorate the harm from the Conditions Crisis:

    i.   He did not distribute more blankets, bedding, or warm clothes;

    ii.   He did not obtain temporary supplies to provide electricity and heat, such as emergency generators or portable space heaters for the housing units, but he did obtain such generators and space heaters for certain staff areas;

    iii.   He did not make provisions for people with serious physical or mental illnesses, the elderly, or people with disabilities;

    iv.   He did not provide flashlights or batteries;

    v.   He did not distribute toiletries and wipes;

    vi.   He did not assign mental health staff to the units for rounds;

    vii.   He did not instruct the medical staff to go to the units for rounds;

    viii.   He did not ask medical staff to affirmatively look up which prescriptions needed to be filled and make sure people received required psychiatric and other medications;

    ix.   He did not arrange for legal calls for people with upcoming hearings, trials, or sentencings;

    x.   He did not provide extra food or bottled water;

xi. He did not implement a partial or complete evacuation when it became known early in the week that heat and power could not be restored in a reasonable amount of time;

xii. He did not transfer people into the empty, more functional jail next door at the East Facility.

148. Warden Quay's failings also forced many MDC staff to work in the same freezing, dark, and dangerous conditions.

149. Warden Quay rejected an offer by New York City to supply emergency generators and emergency blankets. Mayor Bill de Blasio issued a statement on Twitter that the City would send trucks with blankets, hand warmers, and generators "whether they like it or not."

150. Warden Quay systematically and deliberately ignored, or failed to take reasonable measures to address, the visibly deplorable and unconstitutional conditions at MDC during the Conditions Crisis.

**VII.  Warden Quay Makes False and Inaccurate Statements About the Crisis**

151. In addition to his failures to prevent or ameliorate the crisis, Warden Quay prolonged the Conditions Crisis by engaging in deliberate efforts to avoid public scrutiny by misstating facts concerning the severity and nature of the conditions at MDC.

152. Inexplicably, Warden Quay falsely reported that:

a. "inmates have not been confined to their cells";

b. that "heat is in the high 60s and low 70s";

c. the prisoners were still allowed leisure/recreational activities;

d. the heat has never been impacted and is monitored regularly due to the cold weather;

e. the hot water has not been impacted as it is on the same system as the heat;

f. there are no problems with meals, people are still receiving hot meals;

g. there is no problem with medical treatment; medications are still delivered twice daily;

h. the only issue related to medication is that the computers are not working so prisoners cannot request medication through the computers; and

i. medical treatment still can be requested through the units and also during the twice daily medical runs.

153. The Warden's spokesperson falsely wrote in an email that the power failure had "minimally impacted" the jail's housing units: "All housing units have functional lighting . . . [h]eat and hot water has not been impacted. Likewise, inmate meals are not impacted; inmates are receiving regularly scheduled hot meals each day."

154. On Wednesday, February 6, the Department of Justice announced that it would investigate the blackout.

155. After touring MDC with the Warden on February 2, 2019, Representative Jerrold Nadler, a New York Democrat who heads the House Judiciary Committee, criticized the Warden for "an absolute lack of urgency or caring."

## CLASS ACTION ALLEGATIONS

156. Plaintiffs bring this action under Rule 23(b)(3) of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class of all persons similarly situated.

157. Plaintiffs seek to represent a certified Plaintiff class consisting of all persons incarcerated at MDC's West Building during the Conditions Crisis ("the Class").

27

158.    The members of the Class are too numerous to be joined in one action, and their joinder is impracticable. Upon information and belief, the class exceeds 1,000 individuals.

159.    Common questions of law and fact exist as to all Class members and predominate over questions that affect only the individual members. These common questions of fact and law include but are not limited to: (1) whether the conditions of confinement described in this Complaint violate the United States Constitution; (2) what measures Defendant took in response to the Conditions Crisis; (3) whether Defendant followed the emergency plan during the Conditions Crisis; (4) whether Defendant's practices during the Conditions Crisis exposed people at MDC to a substantial risk of serious harm; (5) whether Defendant made false public statements about the conditions of confinement at MDC; (6) whether the Defendant violated the United States Constitution by knowing of and disregarding a substantial risk of serious harm to the safety and health of the Class; (7) what damages should be awarded to redress the harms suffered by the members of the Class as a result of the unconstitutional conditions; and (8) whether punitive damages should be awarded against Defendant for intentional and malicious misconduct.

160.    Defendant's practices and the claims alleged in this Complaint are common to all members of the Class.

161.    Plaintiffs' claims are typical of those of the Class. Plaintiffs were subjected to the inhumane conditions of confinement at MDC during the Conditions Crisis.

162.    The legal theories on which Plaintiffs rely are the same or similar to those on which all Class members would rely, and the harms suffered by them are typical of those suffered by all the other Class members.

163.    Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the Class representatives are consistent with those of the Class members. In addition, Plaintiffs' counsel are experienced in class action and civil rights litigation.

164.    Plaintiffs' counsel know of no conflicts of interest among Class members or between the attorneys and Class members that would affect this litigation.

165.    Use of the class action mechanism here is superior to other available methods for the fair and efficient adjudication of the claims and will prevent the imposition of undue financial, administrative, and procedural burdens on the parties and on this Court, which individual litigation of these claims would impose.

166.    This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class members is impracticable. The damages suffered by members of the Class, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly impractical for such Class members to attempt individual redress for damages.

167.    There will be no extraordinary difficulty in the management of this class action.

**FIRST CAUSE OF ACTION**
(Damages for Violation of the Fifth Amendment)

168.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

169.    Plaintiffs bring this claim on their own behalf and on behalf of the Class.

170.    Plaintiffs and the Class were forced to live without sufficient heat or light, for over a week, in complete darkness and near-freezing temperatures. These conditions were compounded by related deterioration in other conditions of confinement, including being locked in their cells without access to showers or hot water, without exercise, without clean laundry,

29

without access to the commissary, without medical care, without regular access to hot or edible meals, without access to counsel, without communication with their families, all of which, alone and in combination, posed an unreasonable risk of serious damage to Plaintiffs' and the Class members' health and physical and mental soundness.

171.    For the pretrial detainees, these conditions amounted to unlawful punishment.

172.    Defendant was aware or should have been aware of these conditions, which were open and obvious throughout the entire jail.

173.    Defendant knew of and disregarded an excessive risk to health and safety.

174.    Defendant failed to act with reasonable care to mitigate these risks.

175.    Because Defendant failed to act to remedy Plaintiffs' and Class members' degrading and inhuman conditions of confinement in violation of their Fifth Amendment rights, Plaintiffs seek damages pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

176.    Because of Defendant's unlawful conduct, Plaintiffs and Class members have suffered physical injury, pain and suffering, emotional distress, humiliation, embarrassment, and monetary damages.

**SECOND CAUSE OF ACTION**
(Damages for Violation of the Eighth Amendment)

177.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

178.    Plaintiffs bring this claim on behalf of members of the Class who were housed in MDC after their convictions.

179.    Plaintiffs and the Class were forced to live without sufficient heat or light, for over a week, in complete darkness and near-freezing temperatures. These conditions were compounded by related deterioration in other conditions of confinement, including being locked

30

in their cells without access to showers or hot water, without exercise, without clean laundry, without access to the commissary, without medical care, without regular access to hot or edible meals, without access to counsel, without communication with their families, all of which, alone and in combination, posed an unreasonable risk of serious damage to Plaintiffs' and the Class members' health and physical and mental soundness.

180.    Defendant was aware of these conditions, which were open and obvious throughout the entire jail.

181.    Defendant knew of and disregarded an excessive risk to health and safety.

182.    Defendant intentionally or recklessly failed to act with reasonable care to mitigate these risks.

183.    By forcing Plaintiffs and the Class to live in these cruel, unusual, degrading, and inhuman conditions of which Defendant was aware, without legitimate penological purpose, Defendant, acting under color of law and his authority as a federal officer, intentionally or recklessly deprived Plaintiffs and Class members of the minimal civilized measures of life's necessities and subjected Plaintiffs to cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

184.    Because Defendant was and continued to be deliberately indifferent to Plaintiffs' degrading and inhuman conditions of confinement in violation of their Eighth Amendment rights, Plaintiff seeks damages pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

185.    Because of Defendant's unlawful conduct, Plaintiffs and Class members have suffered physical injury, pain and suffering, emotional distress, humiliation, embarrassment, and monetary damages.

WHEREFORE, Plaintiffs Scott, Cerda, and the Class members respectfully request that the Court enter a class-wide judgment:

A.    Certifying this suit as a class action;

B.    Awarding reasonable and just compensatory and punitive damages to Plaintiffs and the Class for the injuries they suffered;

C.    Awarding Plaintiffs reasonable attorney's fees pursuant to the Equal Access for Justice Act 28 U.S.C. § 2412; and

D.    Ordering such other and further relief as this Court deems just, proper and equitable.

Dated:   New York, New York
         February 22, 2019                    EMERY CELLI BRINCKERHOFF
                                              & ABADY LLP

                                              By:    /s/ Katherine R. Rosenfeld
                                                     Katherine R. Rosenfeld
                                                     O. Andrew F. Wilson
                                                     600 Fifth Avenue, 10th Floor
                                                     New York, NY 10020
                                                     (212) 763-5000

                                              *Attorneys for Plaintiffs and the Putative Class*