UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
DAVID SCOTT, JEREMY CERDA, OSMAN AK,              :
MERUDH PATEL, GREGORY HARDY, and LARRY            :
WILLIAMS, individually and on behalf of all others :
similarly situated,                               :         REPORT &
                                                  :         RECOMMENDATION
                    Plaintiffs,                   :         19-CV-1075 (MKB) (SMG)
                                                  :
        -against-                                 :
                                                  :
FORMER WARDEN HERMAN E. QUAY,                     :
FACILITIES MANAGER JOHN MAFFEO, and THE           :
UNITED STATES OF AMERICA,                         :
                                                  :
                    Defendants.                   :
                                                  :
-----------------------------------------------------------------------x
STEVEN M. GOLD, U.S. Magistrate Judge:

## INTRODUCTION

Plaintiffs David Scott, Jeremy Cerda, Osman Ak, Merudh Patel, Gregory Hardy, and

Larry Williams were each detained at the Metropolitan Detention Center ("MDC") in Brooklyn,

New York, on January 27, 2019, when a portion of the facility lost electrical power.  Am.

Compl. ¶¶ 3, 8, Dkt. 29.  Plaintiffs bring this action on behalf of themselves and all others

similarly situated, asserting claims under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S.

388 (1971), against defendants Herman E. Quay, the former Warden of the MDC, and John

Maffeo, the Facilities Manager of the MDC.  Am. Compl. ¶¶ 352–69.  Plaintiffs Scott and Cerda

also assert a claim on their own behalf and on behalf of a putative class for negligence under the

Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671, *et seq.*, against the United

States of America.  Am. Compl. ¶¶ 370–80.

Defendants now move to dismiss the *Bivens* claims for failure to state a claim under Rule

12(b)(6) and the FTCA claim for lack of subject matter jurisdiction under Rule 12(b)(1) of the

Federal Rules of Civil Procedure.  Not. of Mot. to Dismiss, Dkt. 65; Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem. of Law") 3–5, Dkt. 66.  The Honorable Margo K. Brodie has referred defendants' motion to dismiss to me for report and recommendation.  Order dated June 6, 2020.  For the reasons discussed below, I respectfully recommend that the motion to dismiss be granted with respect to the *Bivens* claims against Quay and Maffeo and denied with respect to the FTCA claim against the United States.

## BACKGROUND

On February 22, 2019, plaintiffs Scott and Cerda commenced this action by filing a Complaint asserting *Bivens* claims against Quay.  Compl., Dkt.1.  On November 15, 2019, plaintiffs filed an Amended Complaint, adding Ak, Patel, Hardy, and Williams as plaintiffs, Maffeo and the United States of America as defendants, and a claim for negligence brought by plaintiffs Scott and Cerda under the FTCA.  Am. Compl., Dkt. 29.

As alleged in the Amended Complaint, on January 27, 2019, the MDC sustained a partial power outage when an electrical panel caught fire in the jail's control room.  *Id.* ¶ 45.  The outage caused the failure of "a number of systems and equipment, including overhead lighting and electrical outlets in cells and common areas, phones, computer systems, and overhead lighting and electrical outlets in staff offices and common areas" and the facility thus "switched to emergency lighting."  *Id.* ¶¶ 3, 46.

Plaintiffs claim that, as a result of the partial power outage, they were subjected to unconstitutional conditions of confinement, including a lack of light, heat, hot meals, clean water, and hot water, prolonged detention in cells, plumbing disruptions, lack of access to e-mail, television, and social telephone calls and visits, curtailment of communication with counsel, and denial of, or indifference to, requests for medical attention and care.  *Id.* ¶¶ 57–300.  Plaintiffs

also allege that defendants failed to provide them with, among other things, extra blankets, bedding, clothing, portable space heaters, flashlights, and toiletries during the partial power outage.  *Id.* ¶¶ 7, 50, 310.  These disruptions allegedly persisted until power was fully restored on February 3, 2019.  *Id.* ¶ 22.

Plaintiffs further allege that Warden Quay and Facilities Manager Maffeo, as prison officials, knew that the MDC's infrastructure was failing, that problems with electricity and heat were foreseeable, and that a power outage could occur "at any time."  *Id.* ¶¶ 16–17, 23–44, 301–03, 320–22.  Moreover, plaintiffs allege that, during the period of the partial power outage, Quay and Maffeo were personally aware of the detainees' adverse conditions of confinement and nevertheless failed to take adequate steps to prevent or alleviate these conditions when they occurred.  *Id.* ¶¶ 16–17; 303–12, 323–24.   In particular, plaintiffs allege that Quay was aware of "specific warning signs concerning the jail's electricity and heat," including three blackouts that occurred in the weeks leading up to the partial power outage, *id.* ¶¶ 26, 28, and that Maffeo refused to let electricians into certain relevant areas of the MDC during that time, *id.* ¶ 33.  Plaintiffs allege that, according to Con Edison, the partial power outage was due to the MDC's failure to remedy preexisting issues; rather than fixing these issues, the MDC kept putting "more demands for more power on a weaker system."  *Id.* ¶ 39.

## DISCUSSION

### I.    Plaintiffs' *Bivens* Claims

#### A.  Legal Standard Applicable to Rule 12(b)(6)

Defendants Quay and Maffeo move to dismiss the *Bivens* claims against them for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Defs.' Mem. of Law at 3.  A complaint may survive a motion to dismiss brought under Rule 12(b)(6) only if it

includes "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.  Iqbal* sets forth a two-pronged approach for analyzing motions to

dismiss brought under Rule 12(b)(6).  First, the district court must "identify[ ] pleadings that,

because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at

679.  Although "legal conclusions can provide the framework of a complaint, they must be

supported by factual allegations." *Id.*  Second, "[w]hen there are well-pleaded factual

allegations, a court should assume their veracity and then determine whether they plausibly give

rise to an entitlement to relief." *Id.*

Furthermore, when considering a motion under Rule 12(b)(6), a court may generally

"look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509

(2d Cir. 2007).  However, "[i]n certain circumstances, the court may . . . consider documents

other than the complaint," *id.*, such as "documents attached to the complaint or incorporated in it

by reference, . . . matters of which judicial notice may be taken, or . . . documents either in

plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass

v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

### B.  *Bivens and Recent Supreme Court Developments*

In *Bivens*, the Supreme Court recognized a damages remedy for violations of the Fourth

Amendment's prohibition on unreasonable searches and seizures by federal law enforcement

officers.  403 U.S. at 391–97.  Implying a cause of action for violations of the Fourth

Amendment, the Court determined, was simply a natural extension of its view that a Court

should ensure that every violation of a federally protected right has a remedy. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017).

Since first recognizing an implied right of action under the Constitution, the Supreme Court has allowed a *Bivens* claim to proceed in only two other contexts: (1) a federal employee's employment discrimination claim asserted pursuant to the due process clause of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228 (1979), and (2) a claim for damages under the Eighth Amendment brought by the estate of a federal prisoner who died after receiving inadequate medical care, *Carlson v. Green*, 446 U.S. 14 (1980). The Court has not extended *Bivens* again in the forty years since *Carlson* was decided. *Abbasi*, 137 S. Ct. at 1855 ("These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself."); *see Minneci v. Pollard*, 565 U.S. 118, 124–25 (2012) (collecting cases).

The Court has also, since *Carlson*, altered its perspective on implied rights of action under the Constitution and noted that its "recent precedents cast doubt on the authority of courts to extend or create private causes of action." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402 (2018). In *Abbasi*, the Court acknowledged the marked change in its approach to implying causes of action:

> In the mid-20th century, the Court followed a different approach to recognizing implied causes of action than it follows now. During this "*ancien regime*," the Court assumed it to be a proper judicial function to provide such remedies as are necessary to make effective a statute's purpose.
>
> ***
>
> Later, the arguments for recognizing implied causes of action for damages began to lose their force.
>
> ***

5

> Given the notable change in the Court's approach to recognizing
> implied causes of action . . . the Court has made clear that expanding
> the *Bivens* remedy is now a "disfavored" judicial activity.

137 S. Ct. at 1855, 1857 (internal quotation marks and citations omitted).  The Court went so far

as to say that, were *Bivens*, *Davis*, and *Carlson* being decided today, the analysis—and,

presumably, the outcome—might be different.  *Id.* at 1856.

Since *Abbasi*, the central inquiry when faced with a potential expansion of *Bivens* is

"'who should decide' whether to provide for a damages remedy, Congress or the courts," and

that the answer to that question "most often will be Congress."  *Id.* at 1857 (quoting *Bush v.

Lucas*, 462 U.S. 367, 380 (1983)).  "[S]eparation-of-powers principles are or should be central to

the analysis."  *Id.*

*Abbasi* instructs that deciding whether a *Bivens* claim is cognizable involves two steps.

First, a court must determine whether the plaintiff's claims are different from those asserted in

previous *Bivens* cases, such that the case presents a "new *Bivens* context."  *Id.* at 1859.  Second,

if a case does present a "new *Bivens* context," a court must then consider whether "there are

'special factors counselling hesitation in the absence of affirmative action by Congress.'"  *Id.* at

1857 (quoting *Carlson*, 446 U.S. at 18).  The Supreme Court has not announced a definitive list

of those "special factors" that "counsel[] hesitation," *id.*, but it has stressed that the question to

ask is "whether the Judiciary is well suited, absent congressional action or instruction, to

consider and weigh the costs and benefits of allowing a damages action to proceed."  *Id.* at 1858.

A "special factor" is one that "cause[s] a court to hesitate before answering that question in the

affirmative."  *Id.*  Notably, the Supreme Court stated in *Abbasi* that

> if there is an alternative remedial stricture present in a certain case,
> that alone may limit the power of the Judiciary to infer a new *Bivens*
> cause of action.  For if Congress has created any alternative, existing

> process for protecting the injured party's interest that itself may
> amount to a convincing reason for the Judicial Branch to refrain
> from providing a new and freestanding remedy in damages.

*Id.* (internal quotation marks, alterations, and citations omitted). To constitute a special factor counseling hesitation, an alternative remedy, such as one under state law, "need not be perfectly congruent" with a potential *Bivens* remedy. *Minneci*, 565 U.S. at 129.

### C. This Case Presents a New Bivens Context

A case presents a "new context" if it is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court]." *Abbasi*, 137 S. Ct. at 1859. Nevertheless, "even a modest extension is still an extension." *Id.* at 1864. The Court in *Abbasi* listed some relevant measures of difference, including the rank of the officers involved, the constitutional right asserted, the level of generality of the official action in question, the extent of the judicial guidance available to the officer in question, whether the officer was operating under specific statutory or other legal mandates, and whether there is a risk that the Judiciary would be interfering with the functioning of another branch of the government. *Id.* at 1860.

Here, the Amended Complaint alleges that, during the partial power outage between January 27, 2019, and February 3, 2019, plaintiffs were subjected to harsh conditions of confinement that included, but were not limited to, (1) confinement to cells with no light, Am. Compl., ¶¶ 70, 97, 135, 163, 168, 186, 227; (2) lack of heat while outdoor temperatures were below freezing, *id.* ¶¶ 63, 90, 105, 123, 148, 169, 192, 233; (3) lack of hot meals and hot water, *id.* ¶¶ 73, 76, 126, 146, 152, 237, 239; (4) prolonged detention in cells, *id.* ¶¶ 69, 114, 128, 145, 174, 198, 236; (5) plumbing disruptions, *id.* ¶¶ 119, 206; (6) lack of access to e-mail, social visits, telephone calls, and television, *id.* ¶¶ 71, 78, 124, 151, 156, 175, 181, 201, 209, 242–43; and (7) curtailment of communication with counsel, *id.* ¶¶ 79, 124, 155, 210, 244. Plaintiffs

allege that these conditions of confinement violated their Fifth and Eighth Amendment rights. *Id.* ¶¶ 352–69.

Plaintiffs argue that their claims do not arise in a new *Bivens* context because they are not meaningfully different from the claim the Supreme Court permitted to proceed in *Carlson*. Mem. of Law in Opp. to Defs.' Mot. to Dismiss ("Pls.' Mem. of Law") 6, Dkt. 69. The holding in *Abbasi*, though, undermines plaintiffs' contention. As in this case, plaintiffs in *Abbasi* complained of harsh conditions of confinement. Some of the complaints made in *Abbasi* resemble those made by plaintiffs here, including allegations that detainees were held in their cells for 23 hours each day, denied access to basic hygiene products in their cells, and barred from communicating with the outside world. 137 S.Ct. at 1853. The *Abbasi* plaintiffs sought to hold the facility's warden responsible for allowing these harsh conditions to occur, as plaintiffs do here. *Id.* at 1863. However, the Court held that such claims present a new *Bivens* context because they "bear little resemblance" to the three *Bivens* claims that were previously approved by the Court: "a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma." *Id.* at 1860.

Plaintiffs in *Abbasi* also alleged that the warden violated their Fifth Amendment rights by allowing prison guards to abuse them. *Id.* at 1853. While the Supreme Court in *Abbasi* recognized that there were "significant parallels" to *Carlson* in that both cases involved claims of prisoner mistreatment, it ultimately concluded that the *Abbasi* plaintiffs' prisoner mistreatment claims arose in a new context. *Id.* at 1864. Stressing that "even a modest extension is still an extension," the Court noted that the claims in *Carlson* were predicated on the Eighth Amendment while those in the case before it were brought by pre-trial detainees under the Fifth

Amendment. *Id.* The Court further noted that the legal standard applicable to the failure to provide medical care alleged in *Carlson* was well-established, while in contrast "[t]he standard for a claim alleging that a warden allowed guards to abuse pre-trial detainees is less clear under the Court's precedents." *Id.* at 1864–65.

As noted above, plaintiffs in this case bring conditions of confinement claims under both the Fifth and Eighth Amendments. To the extent plaintiffs' claims invoke the Fifth Amendment and relate to conditions of confinement other than inadequate medical care, the distinction from *Carlson* noted in *Abbasi* applies here as well. *See White v. Hess*, 2020 WL 1536379, at *7 (E.D.N.Y. Mar. 31, 2020) (holding that non-medical conditions of confinement claims present a new *Bivens* context); *Fernandini v. United States*, 2019 WL 2493758, at *10 (S.D.N.Y. Feb. 14, 2019) (holding that non-medical "inhumane" prison conditions present a new *Bivens* context), *report and recommendation adopted in relevant part*, 2019 WL 1033797, at *6 (S.D.N.Y. Mar. 5, 2019).

Plaintiffs' Eighth Amendment claims, particularly those alleging a denial of medical care, arguably raise a closer question because they are brought pursuant to the same constitutional provision and involve the same type of harsh condition as the claims in *Carlson*. Nevertheless, these claims too arise in a new *Bivens* context.

For one thing, the legal standards applicable to plaintiffs' claims in this case, like those applicable to the claims asserted in *Abbasi*, are less clear than those that governed the claims in *Carlson*. Plaintiff in *Carlson* was the mother of a deceased prisoner, suing as administratrix of his estate. 446 U.S. at 16. Plaintiff alleged that prison officials, though "fully apprised of the gross inadequacy of medical facilities and staff" at the federal detention center and of the seriousness of her son's "chronic asthmatic condition," confined him in that facility "against the

advice of doctors" and failed to provide "competent medical attention for some eight hours after he had an asthmatic attack, administered contra-indicated drugs which made his attack more severe, attempted to use a respirator known to be inoperative . . . , and delayed for too long a time his transfer to an outside hospital." *Id.* at 16 n.1. The claims before the Court here, in contrast, involve conditions plaintiffs endured over the course of one week in the wake of an emergency partial power outage and "bear little resemblance" to the chronic failure to provide adequate medical care alleged in *Carlson*, which ultimately resulted in the inmate's death.[1] While the Supreme Court "has long made clear the standard for claims alleging failure to provide medical treatment to a prisoner," *Abbasi*, 137 S.Ct. at 1864, the degree to which officials must maintain the infrastructure of detention facilities, or to which they may be held to account for failing to provide a range of services during a time-limited emergency, is less clearly established.

Moreover, any contention that claims do not arise in a new context simply because they invoke the same Amendment as a previously recognized *Bivens* claim was squarely rejected in *Hernandez v. Mesa*, 140 S.Ct. 735 (2020). In that case, the Court stated that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized," and that to argue otherwise is to

---

[1] The Amended Complaint alleges that plaintiffs experienced a variety of conditions with respect to their medical care. Am. Compl. ¶¶ 86–92 (alleging that before and during the partial power outage, plaintiff Scott had numbness in his hands, a skin fungus requiring topical treatments, and an abscess under his armpit for which he was taking antibiotics and was not seen by a Nurse Practitioner until February 4, 2019 per Court Order); 100, 128–29, 131 (alleging that plaintiff Cerda, who had major depression and anxiety and thought about hurting himself, was not offered any mental health treatment during the partial power outage, and did not report his condition to staff until February 1, 2019); 217–22 (alleging plaintiff Hardy's kidney medication was not delivered to him during the partial power outage, thereby causing pain and swollen glands; he also had "trouble breathing" and his requests for medical care were ignored); 245–51 (alleging that plaintiff Williams, who suffers from hyperthyroidism and takes daily medication, ran out of this medication on February 1, 2019, began experiencing heart palpitations, dizziness, diarrhea, stomach cramps, headaches, anxiety, and nightmares, and was not provided medical care despite his repeated requests during the partial power outage).

demonstrate "a basic misunderstanding of what our cases mean by a new context." 140 S.Ct. at

743.

Finally, a common-sense look at the facts at issue in the two cases makes it clear that

plaintiffs' claims here arise in a significantly different context than those in *Carlson*. *Carlson*

involved allegations concerning the ongoing "gross inadequacy" of the medical facilities at a

prison and extreme deviations from the standard of care for a common medical condition. This

case, in contrast, involves questions about an alleged failure to maintain the electrical system in a

detention facility and to respond properly when that system failed in mid-winter, resulting in a

loss of power during a period with frigid temperatures. While the standard of deliberate

indifference may govern liability in both circumstances, the different contexts involved will

require the Courts to make distinct inquires. In particular, the exigencies of the power outage

likely required prison officials to prioritize certain needs of the detainees in a way that would not

have been required in *Carlson*; this difference will alter the deliberate indifference analysis.

For all these reasons, and bearing in mind the Supreme Court's admonition that even a

modest extension is still an extension, I conclude that plaintiffs' claims in this action arise in a

new *Bivens* context.[2]

### D. There Are Special Factors Counselling Hesitation

Having concluded that this case arises in a "new *Bivens* context," I now consider whether

"there are 'special factors counselling hesitation in the absence of affirmative action by

---

[2] Defendants also argue that the Supreme Court has never implied a *Bivens* remedy under the Fifth Amendment for pre-trial detainees, like plaintiffs Scott and Cerda, or under the Eighth Amendment for convicted—but not yet sentenced—prisoners, like plaintiff Williams. Defs.' Mem. of Law at 8–9 (citing *Bell v. Wolfish*, 441 U.S. 520, 527–28, 535 (1979); *Lareau v. Manson*, 651 F.2d 96, 102 (2d Cir. 1981)). Because I conclude for other reasons that plaintiffs' claims arise in a new context, I do not reach the question of whether the status of plaintiffs as pre-trial detainees or convicted but not yet sentenced defendants is by itself sufficient to constitute a "new context."

Congress.'" *Abbasi*, 137 S.Ct. at 1857 (quoting *Carlson*, 446 U.S. at 18).  This threshold is a "remarkably low" one.  *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009).

In *Abbasi*, the Court identified some criteria for considering whether hesitation is warranted.  First, it noted that "the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide," which entails examining the "burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when . . . the legal system [is] used to bring about the proper formulation and implementation of public policies."  *Abbasi*, 137 S.Ct. at 1858.  Second, some cases will arise "in a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere."  *Id.*  It may also be that "feature[s] of [the] case—difficult to predict in advance—cause[] a court to pause before acting without express congressional authorization."  *Id.*  The Court concluded this aspect of its discussion by noting that, "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy[;]" to do otherwise would fail "to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III."  *Id.*

1.   Separation-of-Powers Concerns are a Special Factor Counselling Hesitation

Defendants argue that "[e]xpanding *Bivens* to cover plaintiffs' conditions claim . . . would imply a remedy in damages based on judicial second-guessing of judgments by prison officials."  Defs.' Mem. of Law at 20.  As defendants correctly note, *see* Defs.' Reply at 12, Congress has delegated the management of the federal prison system to the U.S. Attorney General and the Bureau of Prisons ("BOP"), both of which are within the executive branch of the

federal government.  18 U.S.C. §§ 4001(b)(1) ("The control and management of Federal penal

and correctional institutions, except military or naval institutions, shall be vested in the Attorney

General . . ."); 4042(a)(1) ("The [BOP], under the direction of the Attorney General, shall . . .

have charge of the management and regulation of all Federal penal and correctional

institutions[.]").  Plaintiffs' claims regarding unconstitutional conditions of confinement,

particularly to the extent they involve the allocation of scarce resources to the maintenance of

infrastructure of the MDC as opposed to other pressing needs, implicate the administration of

prisons, which, in turn, involves "separation of powers concerns [that] counsel a policy of

judicial restraint."  *Turner v. Safley*, 482 U.S. 78, 85 (1987).

## 2.  Congress's Silence is Ambiguous

Defendants also argue that, in the years since the enactment of the Prison Litigation

Reform Act ("PLRA") in 1996, "Congress has never provided a damages remedy to federal

prisoners complaining of constitutional violations," thus indicating Congress's reluctance to

extend *Bivens* to new contexts.  Defs.' Mem. of Law at 18–19 (citing *Abdo v. Balsick*, 2019 WL

6726230, at *7 (D. Colo. Dec. 11, 2019)).  In opposition, plaintiffs note that the Court in *Abbasi*

did not affirmatively conclude that Congress's silence suggested its reluctance to expand *Bivens*;

rather, the Court merely stated "[i]t *could be argued* that this suggests Congress chose not to

extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment."

*Abbasi*, 137 S. Ct. at 1865 (emphasis added); *see* Pls.' Mem. of Law at 18.  Plaintiffs also assert

that "Congress presumed the existence of a *Bivens* remedy for prison conditions claims" and, by

its plain language, "intended only to reduce frivolous suits by adding an administrative

exhaustion requirement."  Pls.' Mem. of Law at 17 (emphasis omitted).  Indeed, plaintiffs argue,

"[w]hen the PLRA was debated and passed, not only had the Supreme Court already recognized

a constitutional remedy for prisoner mistreatment claims in *Carlson*, but other circuit courts had routinely done so as well." *Id.* at 17–18 (listing cases in which *Bivens* was recognized as a vehicle for asserting prisoner and detainee abuse claims).

Having considered the parties' arguments, I conclude that the evidence of congressional intent here is too ambiguous to provide meaningful support for either side's position. *See Wilkie v. Robbins*, 551 U.S. 537, 554 (2007) ("It would be hard to infer that Congress expected the Judiciary to stay its *Bivens* hand, but equally hard to extract any clear lesson that *Bivens* ought to spawn a new claim."); *Turkmen v. Ashcroft*, 2018 WL 4026734, at *8 (E.D.N.Y. Aug. 13, 2018) (report and recommendation pending). Inferring intention from inaction necessarily involves speculation, and the degree of speculation involved increases greatly when an inference about intent is based upon the inaction of a legislative body with hundreds of members, each of whom may have their own reasons for not acting. Therefore, I decline to infer what views Congress may have with respect to extending *Bivens* from its failure to pass a law that either provides or precludes a *Bivens*-type remedy for violations of constitutional rights.

### E. An Alternative Remedy Is Available

As noted above, the availability of alternative remedies "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S.Ct. at 1858. Here, plaintiffs not only have an alternative remedy available, they have invoked it.

### 1. The FTCA Provides a Sufficient Alternative Remedy

Defendants argue that "plaintiffs had an alternative existing process because they could have brought—and in fact, in this action, have brought—tort claims under the FTCA." Defs.' Mem. of Law 14–15. Indeed, the Amended Complaint in this action includes a claim for

negligence under the FTCA based upon the same alleged conditions of confinement asserted in support of plaintiffs' *Bivens* claims.  Am. Compl. ¶¶ 370–80.

Plaintiffs argue that the Supreme Court's holding in *Carlson* precludes any argument that a plaintiff's ability to sue under the FTCA impedes that plaintiff's right to bring a *Bivens* claim. Pls.' Mem. of Law at 12.  The Supreme Court in *Carlson* deemed it "crystal clear" that "Congress views FTCA and *Bivens* as parallel, complementary causes of action," *Carlson*, 446 U.S. at 20.  In subsequent decisions, moreover, the Supreme Court has reiterated that "an FTCA claim is simply not a substitute for a *Bivens* action."  *Bueno Diaz v. Mercurio*, 442 F. Supp. 3d 701, 710 (S.D.N.Y. 2020) (internal quotation marks and citations omitted); *see Wilkie*, 551 U.S. at 553 (noting that the "FTCA and *Bivens* remedies were 'parallel, complementary causes of action' and that the availability of the former did not preempt the latter" (quoting *Carlson*, 446 U.S. at 20)); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (quoting *Carlson*, 446 U.S. at 20)); *Bush*, 462 U.S. at 378 (noting that "[n]o statute expressly declared the FTCA remedy to be a substitute for a *Bivens* action").

The reasoning and result in *Abbasi*, though, call into serious question the continued viability of the test articulated in *Carlson* for when the availability of an alternative remedy precludes a *Bivens* claim.  In *Carlson*, the Supreme Court stated that a *Bivens* claim is precluded by an alternative remedy only "when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective."  *Carlson*, 446 U.S. at 18–19 (emphasis in original).  In contrast, the Court in *Abbasi* more broadly concluded that "if Congress has created *any* alternative, existing process for protecting the injured party's interest[,] that itself may amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding

15

remedy in damages." *Abbasi*, 137 S. Ct. at 1858 (internal quotation marks, alterations, and citation omitted) (emphasis added). In emphasizing that "expanding the *Bivens* remedy is now considered a disfavored judicial activity," the Court also observed that its conclusion in *Carlson* "might have been different if [it] were decided today." *Id.* at 1856, 1857 (internal quotation marks and citation omitted).

The Second Circuit has not yet decided whether, in the wake of *Abbasi*, the availability of an FTCA action precludes a *Bivens* remedy. *See* Tr. of Oral Arg. at 6:4-5, Dkt. 91. The Fifth Circuit, though, has invoked the availability of an FTCA claim as a basis for dismissing a *Bivens* action. *Oliva v. Nivar*, 973 F.3d 438, 444 (5th Cir. 2020). Several decisions rendered by district courts within the Second Circuit have similarly concluded that *Carlson*'s analysis of adequate alternative remedies cannot survive *Abbasi* and dismissed *Bivens* claims because the FTCA provides an adequate alternative remedy. *See, e.g., Sosa v. Bustos*, 2020 WL 1940550, at *4 (S.D.N.Y. Apr. 22, 2020); *Oliveras v. Basile*, 440 F. Supp. 3d 365, 372–74 (S.D.N.Y. 2020); *Morrison v. United States*, 2019 WL 5295119, at *3 (S.D.N.Y. Oct. 18, 2019); *Abdoulaye v. Cimaglia*, 2018 WL 1890488, at *7 (S.D.N.Y. Mar. 30, 2018); *Morgan v. Shivers*, 2018 WL 618451, at *5–*6 (S.D.N.Y. Jan. 29, 2018); *see also Style v. Mackey*, 2020 WL 3055319, at *4 (E.D.N.Y. June 8, 2020); *Rivera v. Samilo*, 370 F. Supp. 3d 362, 369 (E.D.N.Y. 2019). In contrast, some courts have continued to rely on *Carlson* and concluded that "[t]he FTCA standing on its own" does not provide a sufficient alternative remedy and thus "does not give the Court reason to hesitate in extending *Bivens*." *Powell v. United States*, 2020 WL 5126392, at *10 (S.D.N.Y. Aug. 31, 2020) (noting that "[t]he Supreme Court has not been bashful in signaling its skepticism of the *Bivens* remedy—if the Court intended to overrule *Carlson*, I am quite sure it would simply do so"); *see Bueno Diaz*, 442 F. Supp. 3d at 711.

Plaintiffs argue further that "[t]he Westfall Act's amendments to the FTCA contemplate the continued viability of suits against individual federal officers for constitutional violations." Pls.' Mem. of Law at 13. The Westfall Act of 1988 provides that a claim against the United States under the FTCA is the exclusive civil remedy for negligent or wrongful acts or omissions by employees of the federal government. 28 U.S.C. § 2679(b)(1). The Act also provides, however, that this limitation does not apply to "a civil action against an employee of the Government which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A). Arguably, by enacting legislation specifically discussing civil actions against government employees for violations of constitutional rights—but declining to eliminate or narrow them—Congress implicitly approved of such actions. *See Abbasi*, 137 S. Ct. at 1880–81 (Breyer, J., dissenting) (arguing that the exception for lawsuits claiming constitutional violations in the Westfall Act makes it clear that Congress views the FTCA and *Bivens* as providing "parallel, complementary causes of action" (quoting *Carlson*, 446 U.S. at 20)).

The problem with plaintiffs' Westfall Act argument is that it failed to persuade the *Abbasi* majority. In his dissent, Justice Breyer invoked passage of the Westfall Act as an indication of Congress's "accept[ance of] *Bivens* actions as part of the law." *Id.* at 1880 (Breyer, J., dissenting). However, the majority, while making explicit reference to the Westfall Act, held, largely on separation-of-powers grounds, that extending *Bivens* to new contexts is now a "disfavored" judicial activity." *Id.* at 1856–57 (majority opinion) (internal quotation marks and citation omitted). Clearly, then, the majority in *Abbasi*—though plainly aware of Justice Breyer's arguments to the contrary—rejected the notion that, by passing the Westfall Act, Congress suggested its support for *Bivens* actions.

Finally, plaintiffs point out that the Supreme Court recently stated in *Hernandez v. Mesa*, 140 S. Ct. 735 (2020) that "the Westfall Act 'left *Bivens* where it found it,' leaving *Carlson* untouched as binding precedent." Pls.' Mem. of Law at 14 (quoting *Hernandez*, 140 S. Ct. at 748 n.9). The majority in *Hernandez*, though, did not explicitly state that the FTCA fails as a general matter to provide an alternative remedy to a *Bivens* claim. Rather, when considered in context, it is clear that the majority was merely observing, in that case involving a U.S. Border Patrol Agent's cross-border shooting of a 15-year-old Mexican child, that "the FTCA bars '[a]ny claim arising in a foreign country.'" *Hernandez*, 140 S. Ct. at 748 (quoting 28 U.S.C. § 2680(k)).

Having considered the authorities cited above and the arguments presented by the parties, I agree with those district courts that have held that, post-*Abbasi*, "the FTCA as a potential remedy counsels hesitation in extending a *Bivens* remedy," *Abdoulaye*, 2018 WL 1890488, at *7, and supports dismissal of plaintiffs' *Bivens* claims.

### 2.  Other Alternative Remedies

Defendants argue that plaintiffs could have sought relief through alternative means in addition to an FTCA claim, including a habeas petition, a motion for injunctive relief, or an administrative claim pursuant to the PLRA. Defs.' Mem. of Law 16–17. Defendants have failed to explain, however, how plaintiffs could have invoked any of these means of seeking relief while confined to their cells during the power outage, or what relief they might have sought or obtained if they filed a habeas petition, motion for injunctive relief, or administrative claim after power was restored and the harsh conditions of confinement they complain about here had abated. Defendants further contend that plaintiffs could have pursued New York state law claims, but relief under state law is unavailable where, as here, it is alleged that defendants acted

18

within the scope of their employment.  *See Rivera*, 370 F. Supp. 3d at 370 ("Plaintiff had some

avenues for redress under New York state law to the extent he claimed that [defendant's] actions

placed him outside the scope of his federal employment.").  Because none of these alternative

remedies were, as a practical matter, available to plaintiffs in any meaningful way, I do not find

them to be an additional basis for hesitation.

Nevertheless, because I find that separation-of-power concerns are a special factor

counselling hesitation and the FTCA provides a sufficient alternative remedy, I respectfully

recommend that defendants' motion to dismiss be granted with respect to the *Bivens* claims

against Quay and Maffeo.[3]

## II.     Plaintiffs' FTCA Claim

### A.     *Legal Standard Applicable to Rule 12(b)(1)*

Defendant United States of America moves to dismiss the FTCA claim asserted by

plaintiffs Scott and Cerda for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the

Federal Rules of Civil Procedure.  *See* Defs.' Mem. of Law at 4–5.  "A case is properly

dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks

the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110,

113 (2d Cir. 2000); *see Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir.

2005)).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a

preponderance of the evidence that it exists."  *Makarova,* 201 F.3d at 113; *see Tandon v.

Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  In evaluating

---

[3]  Defendants also argue that "plaintiffs have failed to plead any specific facts alleging that Facilities Manager
Maffeo personally violated their constitutional rights."  Defs.' Mem. of Law at 21.  Because I recommend dismissal
of plaintiffs' *Bivens* claims on other grounds, I do not consider this alternative argument in support of dismissal of
plaintiffs' *Bivens* claim against Maffeo.

whether a plaintiff has met that burden, "'[t]he court must take all facts alleged in the complaint

as true and draw all reasonable inferences in favor of plaintiff,' but 'jurisdiction must be shown

affirmatively, and that showing is not made by drawing from the pleadings inferences favorable

to the party asserting it.'"  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)

(citations omitted), *aff'd*, 561 U.S. 247 (2010).  Moreover, a court evaluating a Rule 12(b)(1)

motion may consider affidavits and other materials outside the pleadings.  *See Pyskaty v. Wide*

*World of Cars, LLC*, 856 F.3d 216, 223 (2d Cir. 2017); *Samele v. Zucker*, 324 F. Supp. 3d 313,

321 (E.D.N.Y. 2018).

### B.  Plaintiffs Scott and Cerda Exhausted their Administrative Remedies

The FTCA waives sovereign immunity for injuries arising from the tortious conduct of

federal officers or agents acting within the scope of their office or employment.  *See* 28 U.S.C. §

1346(b)(1).  Plaintiffs seeking to bring a claim under the FTCA must first exhaust their

administrative remedies by presenting their claim to the appropriate federal agency and receiving

a final denial of the claim in writing.  28 U.S.C. § 2675(a).  A failure of the federal agency to

dispose of a claim within six months may, at the claimant's option, be deemed a final denial.  *Id.*

Notably, "[f]ailure to exhaust the agency's administrative remedies within the statute of

limitations will render the claim forever barred."  *Roberson v. Greater Hudson Valley Family*

*Health Ctr., Inc.*, 2018 WL 2976024, at *2 (S.D.N.Y. June 12, 2018) (internal quotation marks

and citation omitted).  The exhaustion requirement is "jurisdictional and cannot be waived."

*Celestine v. Mount Vernon Neighborhood Health Cir.*, 403 F.3d 76, 82 (2d Cir. 2005).

In addition, FTCA claims are subject to two limitations periods: first, a tort claim must be

presented to the appropriate federal agency within two years of its accrual, and second, the

subsequent federal action must be commenced within six months after the agency mails its final

20

denial.  28 U.S.C. § 2401(b).  If either deadline is not met, the claim is "forever barred."  *Id.*
Like a failure to exhaust, failure to comply with the FTCA's limitations periods constitutes a
jurisdictional defect that deprives the court of subject matter jurisdiction.  *Abdelmoneim v. Dep't
of Army*, 2014 WL 1277905, at *2 (E.D.N.Y. Mar. 27, 2014).

 Here, plaintiffs Scott and Cerda filed their administrative tort claims with the BOP on
April 30, 2019, two months after the action was commenced against Quay.  Am. Compl. ¶¶ 95,
133.  The BOP issued a final denial on October 31, 2019.  *Id.*  Thereafter, plaintiffs filed an
Amended Complaint on November 15, 2019, adding—for the first time—an FTCA claim by
Scott and Cerda against the United States.[4]  Defendants argue that "the FTCA requires
jurisdiction to exist at the time of the filing of the original Complaint, depriving the Court of
jurisdiction" over the FTCA claim asserted by Scott and Cerda.  Defs.' Mem. of Law at 26.   The
question then becomes whether the Amended Complaint may serve as the pleading that instituted
Scott's and Cerda's FTCA claim, or whether they filed the original Complaint prematurely
because their administrative tort claims had not yet been filed or denied.

 An action brought under the FTCA "shall not be instituted" against the United States
until the claim has been finally denied.  28 U.S.C. § 2675(a).  The Supreme Court has
determined that, in this context, "the normal interpretation of the word 'institute' is synonymous
with the words 'begin' and 'commence.'"  *McNeil v. U.S.*, 508 U.S. 106, 112 (1993).  In other
words, a plaintiff must fully exhaust administrative remedies before invoking the judicial

---

[4] In the original Complaint, plaintiffs Scott and Cerda asserted two *Bivens* claims against Warden Quay.  Compl.,
Dkt. 1.  The Amended Complaint restates the original *Bivens* claims and asserts them on behalf of original plaintiffs
Scott and Cerda and newly added plaintiffs Ak, Patel, Hardy, and Williams, and asserts them against original
defendant Quay and newly added defendant Maffeo.  The Amended Complaint also adds a claim under the FTCA
on behalf of plaintiffs Scott and Cerda.  Although defendants argue that "the Court lacks jurisdiction over the FTCA
claims" brought by plaintiffs Ak, Patel, Hardy, and Williams because "the Amended Complaint was filed before
they exhausted their administrative remedies," Defs.' Mem. of Law at 26, it is clear that these plaintiffs do not assert
FTCA claims in the Amended Complaint.

process.  *See id.*  Indeed, courts have noted that "[a]llowing claimants generally to bring suit under the FTCA before exhausting their administrative remedies and to cure the jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system."  *Duplan v. Harper*, 188 F.3d 1195, 1199 (10th Cir. 1999) (holding that the district court had jurisdiction over an FTCA claim because the government *agreed* that "the amended complaint effectively constituted a new action and agreed to administrative closure of the first action pending exhaustion"); *see Hoffenberg v. Provost*, 154 F. App'x 307, 310 (3d Cir. 2005) (holding that the FTCA claim was properly dismissed as unexhausted because it was still pending before the BOP when plaintiff filed his original complaint alleging an FTCA claim; therefore, the date on which the amended complaint was filed, which was after the conclusion of the BOP proceedings, could not serve as the date the federal suit was instituted).

In this case, unlike in *Hoffenberg*, the original Complaint did not include any claims under the FTCA or against the United States or the BOP as a defendant; rather, the original Complaint alleged only *Bivens* claims against Quay.  In a case involving circumstances more like those at issue here, the Eighth Circuit held that an FTCA claim that was unexhausted when the original complaint was filed, but exhausted at the time of the amended complaint, could go forward.  *See Mackovich v. U.S.*, 630 F.3d 1134, 1135–36 (8th Cir. 2011).  In *Mackovich*, the claims asserted in the original and amended complaints were different: the plaintiff initially sued under the FTCA for medical malpractice, then abandoned that claim in his amended complaint and sued under the FTCA claiming that he slipped and fell in a poorly maintained dining area.  *See id.* at 1134.  The Court construed plaintiff's amended complaint as "an entirely new action."  *Id.* at 1136.  Similar results were reached in cases where plaintiffs amended existing

complaints to add a new FTCA claim.  *See Corley v. United States Dep't of Justice*, 2016 WL 11395009, at *5 (E.D.N.Y. Sept. 6, 2016) (denying motion to dismiss as unexhausted because "[p]laintiff made no claims or allegations in his original complaint about his treatment at the MCC.  Plaintiff filed his amended complaint alleging FTCA claims about his treatment at the MCC only after his related administrative claims were finally denied"), *report and recommendation adopted sub nom. Corley v. United States*, 2016 WL 5394705 (E.D.N.Y. Sept. 27, 2016); *Malouf v. Turner*, 814 F. Supp. 2d 454, 461 (D.N.J. 2011) ( "As Plaintiff's action did not raise a claim under the FTCA for tort damages related to his January 2009 slip and fall until he filed his Amended Complaint, which occurred after exhaustion of his administrative tort claim by the BOP, the Court finds no jurisdictional restriction in the plain language of the statute."); *Grancio v. De Vecchio*, 572 F. Supp. 2d 299, 310–11 (E.D.N.Y. 2008); *Vitrano v. United States*, 2008 WL 1752221, at *4 (S.D.N.Y. Apr. 16, 2008) ("When and if [plaintiff] is able to plead satisfaction of jurisdictional prerequisites, he will be entitled to assert [FTCA] claims either by amending his complaint here or by filing a new action.").  Thus, because plaintiffs Scott and Cerda asserted their FTCA claim against the United States for the first time in the Amended Complaint, the date of the Amended Complaint is the date the federal suit was instituted for jurisdictional purposes.  By that date, of course, the claim had properly been exhausted.

Although the government relies on *McKiver v. Fed. Bureau of Prisons of New York*, 2019 WL 1369460 (S.D.N.Y. Mar. 26, 2019), the holding in that case is based on facts that are readily distinguishable from those presented here.  In *McKiver*, the district court held that the FTCA claims against individual federal employees should be dismissed as unexhausted because plaintiff filed his administrative tort claims with the court, not with the appropriate federal agency, and did so only *after* he instituted the action.  *McKiver*, 2019 WL 1369460, at *4.  The

court noted that "[t]he only potential argument to be made to the contrary" is that the action was not instituted until the Attorney General certified that the individual federal employees "were acting within the scope of their official duties," at which the time a tort claim against the individuals could be deemed a claim against the United States. *Id.* (citing *Grancio*, 572 F. Supp. 2d at 311). However, the court held that the case was distinguishable from *Grancio* because plaintiff's "initial pleadings included his FTCA claim," not just tort claims more generally, and explicitly named the BOP as a defendant. *Id.* Moreover, the court had already "effectively deemed the suit to be against the United States" in an earlier decision. *Id.*

For these reasons, I conclude that plaintiffs Scott and Cerda have exhausted their administrative remedies and properly asserted their FTCA claim only after having received a written denial of their administrative tort claims.

### C. The Discretionary Function Exception

Defendants alternatively challenge the Court's jurisdiction by invoking the FTCA's discretionary function exception to the federal government's limited waiver of sovereign immunity. The exception bars liability for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). A claim that falls within this exception must be dismissed for lack of subject matter jurisdiction. *See Huntress v. United States*, 810 F. App'x 74, 76 (2d Cir. 2020) (petition for a writ of certiorari filed); *Fazi v. United States*, 935 F.2d 535, 539 (2d Cir. 1991).

Courts decide whether the discretionary function exemption applies according to the so-called *Berkovitz-Gaubert* test, a reference to *Berkowitz v. United States*, 486 U.S. 531 (1988) and

*United States v. Gaubert*, 499 U.S. 315 (1991). Under that test, the exception applies only when the following two conditions are met: "(1) the acts alleged to be negligent must be discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation, and (2) the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis." *USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia*, 681 F.3d 103, 111–12 (2d Cir. 2012) (quoting *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000)).

"Plaintiffs bear the initial burden to state a claim that is not barred by the [discretionary function exception]." *Molchatsky v. United States*, 713 F.3d 159, 162 (2d Cir. 2013). However, "[n]either the Second Circuit nor the United States Supreme Court has explicitly answered whether the United States or a plaintiff bears the ultimate burden of proving the applicability of the discretionary function exception." *Fernandini*, 2019 WL 1033797, at *3 n.1 (quoting *Ruiz ex rel. E.R. v. United States*, 2014 WL 4662241, at *4 n.5 (E.D.N.Y. Sept. 18, 2014)).

Where "a regulation, rule, or statute 'allows the employee discretion,' a 'strong presumption' arises that the employee's acts 'are grounded in policy when exercising that discretion.'" *Enigwe v. Zenk*, 2007 WL 2713849, at *9 (E.D.N.Y. Sept. 14, 2007) (quoting *Gaubert*, 499 U.S. at 324). Pursuant to statute, the BOP has "charge of the management and regulation of all Federal penal and correctional institutions," 18 U.S.C. § 4042(a)(1), and must "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States," *id.* § 4042(a)(2). The statute "does not direct the BOP how to fulfill [these] duties, nor does the statute mandate particular conduct by the BOP"; rather, "[t]he statute gives the BOP officials great discretion to administer their duties as they see fit." *Ojo v. United States*, 2019 WL 3852391, at *7 (E.D.N.Y. Aug. 15,

2019), *report and recommendation adopted*, 2019 WL 4602823 (E.D.N.Y. Sept. 23, 2019); *see also Fernandini*, 2019 WL 1033797, at *4 (concluding that "decisions regarding the best way to comply with this broad statutory mandate are discretionary in nature"); *Enigwe*, 2007 WL 2713849, at *8 (noting that "in general decisions regarding the best way to safeguard prisoners are discretionary in nature"); *Scrima v. Hasty*, 1998 WL 661478, at *3 (S.D.N.Y. Sept. 24, 1998) ("The absence of specific guidelines of appropriate conduct by BOP officials in administering" their duties to provide suitable quarters and provide for the safekeeping, care, and subsistence of inmates "leaves judgment or choice to BOP officials").  It thus appears that the first prong of the *Berkovitz-Gaubert* test is satisfied.

However, "[t]he inquiry as to whether the discretionary function exception is applicable does not end simply with a finding that a discretionary function is involved."  *Scrima*, 1998 WL 661478, at *3.  Rather, to fall within the exception, the challenged conduct must be "based on 'considerations of public policy,' since the purpose of the exception is to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *Enigwe*, 2007 WL 2713849, at *8 (quoting *Berkovitz*, 486 U.S. at 537)*; see also Hartman v. Holder*, 2009 WL 792185, at *6 (E.D.N.Y. Mar. 23, 2009) (noting that the presumption that arises when a statute or regulation allows a government agent to exercise discretion "is not irrefutable").  Thus, even conduct within the discretion of a government official may not fall within the discretionary function exception.

In this regard, the Second Circuit has held, under the so-called "negligent guard theory," that an official's "lazy or careless failure to perform his or her discretionary duties" are negligent acts that "neither involve an element of judgment or choice within the meaning of *Gaubert* nor are grounded in considerations of governmental policy."  *Chen v. United States*, 2011 WL

2039433, at *6 (E.D.N.Y. May 24, 2011), *aff'd*, 494 F. App'x 108 (2d Cir. 2012) (quoting *Coulthurst*, 214 F.3d at 109, 110)*; see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475–76 (2d Cir. 2006); *Young v. United States*, 2014 WL 1153911, at *15 (E.D.N.Y. Mar. 20, 2014) (stating that a "[p]laintiff can overcome the FTCA's discretionary function exception if he can demonstrate that the officers' actions in [his] case were the result of laziness, carelessness, or inattentiveness, rather than grounded in policy considerations"); *Hartman*, 2009 WL 792185, at *7–*8.  "Where the negligent guard theory applies, a plaintiff's claims are not barred by the discretionary function exception."  *Chen*, 2011 WL 2039433, at *6.

When the facts alleged in a complaint suggest "numerous potential ways" in which a government official's conduct may have resulted in the injuries complained of, and only some of those ways fall within the discretionary function exception while others support a finding of laziness, carelessness or inattentiveness, a court "err[s] in assuming that the negligence alleged in the complaint involved only discretionary functions."  *Coulthurst*, 214 F.3d at 109, 110.  A court need not determine "the merits of the negligent guard theory in [a particular] case, or even . . . its capacity to withstand summary judgment," to allow a claim to proceed at the pleading stage.  *Triestman*, 470 F.3d at 476; *see also Aurecchione*, 426 F.3d at 638.

The facts alleged in plaintiffs' Amended Complaint, if believed, could support a finding that the injuries plaintiffs claim to have suffered were caused by the laziness, carelessness, or inattentiveness of Warden Quay and Facilities Manager Maffeo.  With respect to MDC's infrastructure, for example, plaintiffs allege that Warden Quay was aware of warning signs about the electricity and heat at the MDC in the weeks leading up to the power outage, and point out in particular that the MDC sustained several power outages in the three months leading up to the January 27, 2019 outage.  Am. Compl. ¶¶ 26–29.  According to plaintiffs, Con Edison has

attributed the January 27, 2019 outage to a failure to address pre-existing infrastructure problems at the MDC. *Id.* ¶ 39.

Plaintiffs similarly allege that the MDC had been struggling with heating issues for two weeks prior to January 27, 2019. *Id.* ¶¶ 32, 34–35. The inadequate heat during the outage was made worse, plaintiffs allege, by the failure of MDC staff to reset heating controls properly after coils were repaired on January 21, 201. *Id.* ¶ 49.

The Amended Complaint includes similarly specific allegations with respect to the failure of prison officials to address the harsh conditions that ensued after power was lost. For example, despite frigid temperatures, prison officials did not provide detainees with additional blankets or warm clothing. *Id.* ¶¶ 66, 143, 171, 195, 235, 264, 267. Detainees were locked in their cells and no provisions were made for them to be able to make telephone calls or visit the law library. *Id.* ¶¶ 71, 124, 151, 175, 242, 273. Nor were any arrangements made to provide medical care or prescription drugs, even to detainees with serious conditions. *Id.* ¶¶ 82, 224, 245–51, 279–80. Officials apparently took no steps to provide flashlights, clean water, hot food, or clean bedding and laundry. *Id.* ¶¶ 77, 111, 118, 285–88, 291, 310(e)(iv).

According to plaintiffs, Warden Quay did not have a plan in place to address an emergency like the January 27, 2019 power outage before it occurred and took no steps to develop one once power was lost. *Id.* ¶ 310(a). The Warden even failed to transfer detainees who required powered equipment for respiratory support until several days into the outage. *Id.* ¶ 310(c). And when the City of New York offered to provide emergency blankets and generators, Warden Quay declined the offer. *Id.* ¶ 312.

Defendants rely on *Spotts v. United States*, 613 F.3d 559 (5th Cir. 2010) to support their contention that the discretionary function exemption supports dismissal. *Spotts*, however, is

readily distinguishable from this case.  First, the conditions of confinement challenged in *Spotts* arose in the aftermath of a natural disaster—a hurricane—that no amount of maintenance could have avoided.  *Id.* at 563.  Moreover, the primary contention made by the plaintiffs in *Spotts* was that the warden declined to evacuate the entire prison in preparation for a natural disaster and not, like here, that prison officials failed to maintain the building properly even after warnings that a loss of power was likely.  *Id.* at 563–65.  Finally, there is no discussion in *Spotts* of the negligent guard theory pressed by plaintiffs here.  *Id.* at 572–73.

It is conceivable that the United States could establish that MDC officials engaged in the conduct and made the decisions challenged by plaintiffs based upon considerations of public policy.  Indeed, the individual defendants (named only in the *Bivens* claims discussed above) have submitted declarations that tend to support such a conclusion.  Decls. of Herman Quay & John Maffeo, Dkt. 65-1.  But the well-pleaded allegations of the Amended Complaint may also support a finding that the power outage was the result of careless inattention to the deteriorating infrastructure at the MDC and that the harsh conditions that ensued when power was lost were not properly addressed out of lack of concern and laziness.

For all these reasons, I conclude that plaintiffs have "presented facts that the Court concludes support[] a finding that [Quay's and Maffeo's] decisions were careless or inattentive and not rooted in policy considerations.  At the Rule 12(b)(1) stage, that is all that is required for plaintiff[s'] cause of action to continue."  *Hartman,* 2009 WL 792185, at *11.  I therefore respectfully recommend that defendants' motion to dismiss Scott's and Cerda's FTCA claim against the United States be denied.

CONCLUSION

For the reasons stated above, I respectfully recommend that the motion to dismiss be granted with respect to the *Bivens* claims asserted against defendants Quay and Maffeo and denied with respect to the FTCA claim brought by plaintiffs Scott and Cerda against the United States.

Any objections to the recommendations made in this Report must be made within three weeks[5] after filing of this Report and Recommendation and, in any event, on or before December 7, 2020. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former ten-day limit).

                                            /s/

                                        Steven M. Gold
                                        United States Magistrate Judge

Brooklyn, New York
November 16, 2020

*U:\#JAV 2019-2020\Scott v. Quay 19-CV-1075\Final R&R 11.16.docx*

---

[5] The Court is giving the parties an additional week to file their objections in light of the Thanksgiving holiday next week.