UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
─────────────────────────────

DAVID SCOTT, JEREMY CERDA,
OSMAN AK, MERUDH PATEL,
GREGORY HARDY, and LARRY
WILLIAMS, individually and on behalf of
all others similarly situated,

**MEMORANDUM & ORDER**

19-cv-1075 (ERK) (PK)

Plaintiffs,

– against –

FORMER WARDEN HERMAN E.
QUAY, FACILITIES MANAGER JOHN
MAFFEO, and THE UNITED STATES OF
AMERICA,

Defendants.
─────────────────────────────

KORMAN, *J*.:

Plaintiffs brought this Federal Tort Claims Act (FTCA) action for negligence

on behalf of a putative class of persons incarcerated at the Bureau of Prisons' (BOP)

Metropolitan Detention Center (MDC) facility in Brooklyn during a power outage.[1]

The complaint alleged that on January 27, 2019, during a period of severe winter

weather, the West Building at the MDC lost power because of an electrical fire. ECF

───────────────

[1] Plaintiffs also brought claims under *Bivens v. Six Unknown Fed. Narcotics Agents*,
403 U.S. 388 (1971). Those claims were dismissed and they are not discussed here.

1

No. 29 at 1–2.[2] MDC staff were unable to restore power until February 3, 2019, a week later. *Id.* at 1. As a result of the power outage, those held in the West Building were allegedly subjected to "inhumane conditions that posed unreasonable and substantial risks to their health and safety," which the complaint referred to as the "Conditions Crisis." *Id.* at 2, 16–43. Plaintiffs now move to certify a class pursuant to Federal Rule of Civil Procedure 23.

## I. BACKGROUND

Putative class representatives David Scott and Jeremy Cerda, as well as plaintiffs Osman Ak, Merudh Patel, Gregory Hardy, and Larry Williams, were incarcerated in the West Building when the power went out. Plaintiffs support their motion to certify a class with declarations and two documents incorporated by reference: a report from the Office of the Inspector General within the Department of Justice and congressional testimony by the Executive Director of the Federal Defenders of New York, David E. Patton.[3] Taken together, this evidence paints a

---

[2] All citations to ECF documents are to the page number of the filed PDF located in the header, not the internal pagination.

[3] *See* Office of the Inspector Gen., U.S. Dep't Justice, Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates (2019), https://oig.justice.gov/reports/2019/e1904.pdf [hereinafter OIG Rep.]; *The Federal Bureau of Prisons and Implementation of the First Step Act: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Sec. of the H. Comm. on the Judiciary*, 116th Cong. (2019) (statement of David E. Patton, Executive Director, Federal Defenders of New York) [hereinafter Patton Testimony].

harrowing picture of prison conditions in the wake of the fire and power outage. In particular, the evidence describes a series of inhumane and potentially dangerous conditions that affected residents throughout the West Building during the week without power. I briefly summarize plaintiffs' evidentiary showings made for the purposes of this motion, bearing in mind that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013).

A. *Lockdown Conditions*

After the power outage, MDC staff "ordered a lockdown of everyone in their cells." ECF No. 131-3 at 3 ¶ 7; *see also* ECF No. 131-5 at 3 ¶ 6 ("staff ordered that everyone immediately lock-in to their cells."). Scott "was locked in his [cell] for 24 hours a day for several days," while Patel was "locked down for 24 hours a day for the next seven days, without leaving [his] freezing cell a single time." ECF No. 131-2 at 3 ¶ 7; ECF No. 131-4 at 3 ¶ 12. Williams was initially allowed to leave his cell "for a few hours each day," but by February 1, he "was locked in [his] freezing cell for 24 hours a day." ECF No. 131-6 at 3 ¶ 9. Similarly, Hardy was "locked alone in [his] freezing cell" for "24 hours a day for several days" and "was not permitted to leave." ECF No. 131-5 at 3 ¶ 13. The OIG report found that MDC staff "confin[ed] inmates in their cells for extended periods of time." OIG Rep. at 22. Congresswoman Nydia Velazquez twice toured the West Building and found that

residents had been locked down for at least 48 hours straight, despite initial assurances by MDC staff that the lockdown was only a temporary measure to facilitate a count of the residents. Patton Testimony at 3.

B. *Lack of Light*

West Building residents spent the Conditions Crisis "immersed in complete darkness." ECF No. 131-3 at 3 ¶ 9; *see also* ECF No. 131-5 at 3 ¶ 7. Scott had no light in his cell, "could not read, . . . [and] ate meals in the dark" even though he "could not see [his] own food." ECF No. 131-2 at 3 ¶ 8. Patel spent "seven days in the dark" in the Special Housing Unit. ECF No. 131-4 at 3 ¶ 6. A representative of the Federal Defenders who toured the facility on February 1 found that the cells were "pitch black," with only the emergency lighting in the common areas operational. Patton Testimony at 3.

C. *Lack of Heat or Adequate Clothing*

All the plaintiffs endured "frigid temperatures" during the Conditions Crisis. ECF No. 131-2 at 3 ¶ 14. Scott had no heat in his cell, "air vents . . . were blowing cold air," and the "frigid temperatures made it impossible to stay warm." *Id.* at 3 ¶¶ 9, 14. Ak was locked in his "freezing cell" without heat and "subjected to extremely cold temperatures." ECF No. 131-3 at 3 ¶¶ 10–11. He attempted to stop the cold wind from blowing under his cell door by blocking it with a towel. *Id.* at 3 ¶ 12. Patel's cell was "extremely cold" and he also attempted to "prevent wind

chills" with a towel, but an MDC officer ordered him to remove it. ECF No. 131-4 at 3 ¶ 7. Hardy's cell was "freezing" and he "began to feel extremely cold." ECF No. 131-5 at 3 ¶¶ 8–9. Williams's cell "was entirely made of metal and soon felt like a freezer." ECF No. 131-6 at 3 ¶ 8.

The OIG Report concluded that the heating issues predated the power outage, but that "long-standing unaddressed temperature regulation issues . . . combined with the extremely cold outdoor temperatures, caused temperatures in certain inmate housing units . . . to drop below the BOP target of 68 degrees [Fahrenheit]." OIG Rep. at 11; *see also* Patton Testimony at 4 ("There were longstanding facilities management and building maintenance problems, and those problems were the cause of the crisis. There were in fact serious heat problems—problems that pre-dated the electrical fire and were exacerbated by MDC employees' mistakes."). The Federal Defenders representative reported that some cells had heat, while "others were frigid." Patton Testimony at 3. During a visit the next day, another representative found that one cell "registered 50 degrees [Fahrenheit] on a portable thermometer." *Id.*

The cold was exacerbated by MDC staff's failure to provide residents with adequate clothing. Scott had only "one cotton short-sleeved jumpsuit, undershirts, underwear and socks" but "had no long-sleeved shirt or warm layers." ECF No. 131-2 at 3 ¶¶ 11. He "wore the same clothes for a week and rotated amongst three pairs

of underwear." *Id.* at 3 ¶ 12, 4 ¶ 21. Ak had "two pairs of pants, two shirts, underwear, and socks" along with one blanket. ECF No. 131-3 at 3 ¶¶ 13–14. He layered his clothes and wrapped himself in the blanket but was unable to stay warm. *Id.* at 3 ¶ 16. Patel had "one shirt, one pair of underwear, [] one jumpsuit . . . one blanket and one towel." ECF No. 131-4 at 3 ¶¶ 8–10. He had to "curl up to retain body heat." *Id.* at 3 ¶ 11. Hardy had a sweater, sweatshirt, wool hat, and longjohns, but he did not have replacements and was forced to wear the same clothes for a week. ECF No. 131-5 at 3 ¶ 10, 4 ¶ 21. Williams had "one-cotton short-sleeved jumpsuit, undershirts, underwear, one long-sleeved shirt, and socks . . . [and] one blanket." ECF No. 131-6 at 3 ¶ 10. None of the plaintiffs were offered additional clothing or blankets. ECF No. 131-2 at 3 ¶ 12; No. 131-3 at 3 ¶ 15; ECF No. 131-4 at 3 ¶ 9; ECF No. 131-5 at 3 ¶ 11; ECF No. 131-6 at 3 ¶ 11. The commissary did not function during the power outage, preventing plaintiffs from buying additional supplies to keep warm. OIG Rep. at 18; ECF No. 131-2 at 4 ¶ 18; ECF No. 131-3 at 4 ¶ 19; ECF No. 131-4 at 3 ¶ 14; ECF No. 131-5 at 3 ¶ 16; ECF No. 131-6 at 3 ¶ 12.

The OIG Report noted that some residents had purchased cold-weather items prior to the outage, but that those who "could not afford to do so, or had not done so [before the commissary closed] . . . likely felt the coldest." OIG Rep. at 17. The Federal Defenders found that "[t]he majority [of residents] were not given extra blankets or long sleeved clothing." Patton Testimony at 4.

D.    *Lack of Access to Hot Food and Water*

Plaintiffs were deprived of hot food during the Conditions Crisis.  Scott "received meals later than the normal mealtimes and the food was often cold," causing him to be "constantly hungry throughout the Conditions Crisis."  ECF No. 131-2 at 4 ¶ 17.  Ak's meals were also delayed and cold, and "[o]n some occasions, BOP staff did not provide meals" at all.  ECF No. 131-3 at 4 ¶ 18.  Patel received "bagged, cold food" and "felt very hungry throughout the Conditions Crisis."  ECF No. 131-4 at 3 ¶ 13.  For Hardy, "[s]ome meals were skipped," and he "relied on eating food products [he] had purchased from the Commissary before the Conditions Crisis began."  ECF No. 131-5 at 3 ¶¶ 14–15.  However, he was "thirsty throughout the Conditions Crisis."  *Id.* at 3 ¶ 17.  Williams was forced to serve cold food to other residents and noticed meals "being delivered cold" and left out to cool further.  ECF No. 131-6 at 3–4 ¶ 13.  With the commissary closed, plaintiffs were unable to buy food to supplement what MDC staff provided.  ECF No. 131-2 at 4 ¶ 18; ECF No. 131-3 at 4 ¶ 19; ECF No. 131-4 at 3 ¶ 14; ECF No. 131-5 at 3 ¶ 16; ECF No. 131-6 at 3 ¶ 12.  The OIG report found that MDC staff provided meals and prepared food hot, but that longer delivery times due to lockdown conditions may have allowed food to cool.  OIG Rep. at 27–28.

Plaintiffs also lacked access to hot water for cleaning, bathing, and laundry during the Conditions Crisis.  Scott had "no access to hot water" and was forced to

clean himself in his cell sink and take cold showers. ECF No. 131-2 at 4 ¶ 20. Ak "could barely bring [him]self to take a shower because of the cold water" and he "was concerned about getting sick." ECF No. 131-3 at 3 ¶ 17. Patel, too, feared getting sick from cold showers. ECF No. 131-4 at 4 ¶ 16. The water in Hardy's cell "was so cold that it sometimes froze over." ECF No. 131-5 at 4 ¶ 19. One resident suffering from ulcerative colitis showed the Federal Defenders representative "bloody bedding that had not been changed because of the lack of laundry services." Patton Testimony at 3.

E.    *Lack of Access to Counsel and Visitation*

MDC staff restricted communication and visitation with family and counsel during the Conditions Crisis. Scott "had no access to email, phone calls, or television . . . other than the brief periods when [he] was permitted out of [his] cell and the Federal Defender phone line was available." ECF No. 131-2 at 5 ¶ 25. MDC staff turned Scott's girlfriend away when she attempted to visit, and he was unable to receive counsel visits. *Id.* at 5 ¶¶ 26–27. Ak, Hardy, and Williams were denied access to any form of communication or visitation. ECF No. 131-3 at 4 ¶¶ 23–26; ECF No. 131-5 at 4 ¶¶ 25–27; ECF No. 131-6 at 4 ¶¶ 17–19. Patel was denied access to communication or visitation, and his fiancée was turned away by MDC staff. ECF No. 131-4 at 4 ¶¶ 20–22. The OIG Report faulted MDC staff for failing "to recognize the importance . . . of providing information to inmates and external stakeholders

about the status of conditions in the jail, the status of legal and social visiting, and the reasons for canceling visiting." OIG Rep. at 39. The report also noted that MDC "houses a significant population of pretrial inmates, some of whom may require daily access to counsel to prepare for trial," meaning that "it was critical . . . to keep inmates, counsel, and the courts informed about any disruptions to legal visiting." *Id.*

### F. *Lack of Communication from MDC Staff*

MDC staff failed to communicate with West Building residents. After the lights went out, the situation was "loud and hostile" and "[p]eople were banging on their cells in frustration" because "no information was being provided to them about anything." ECF No. 131-2 at 4 ¶ 22; *see also* ECF No. 131-3 at 4 ¶ 21; ECF No. 131-5 at 4 ¶ 22. Patel "did not know what was going on," causing him to feel "worried and emotional throughout the Conditions Crisis." ECF No. 131-4 at 4 ¶ 19. The OIG concluded that MDC staff "could have done more to keep inmates informed," and that lack of information about what was happening contributed to "unrest inside the jail." OIG Rep. at 30, 39.

### G. *Lack of Access to Medical Care*

The power outage disrupted access to medical care. Scott requested medical care several times, but MDC staff ignored him. ECF No. 131-2 at 5 ¶ 32. Hardy did not receive his kidney medication during the Conditions Crisis, causing him to suffer

from pain and swollen glands.  ECF No. 131-5 at 4–5 ¶¶ 31–33.  Like Scott, he made

several requests for medical care during the Conditions Crisis which were ignored.

*Id.* at 5 ¶ 35.  Williams was unable to refill his medication for hyperthyroidism during

the Conditions Crisis, causing him to "experience heart palpitations, dizziness,

diarrhea, stomach cramps, headaches, and other symptoms."  ECF No. 131-6 at 4

¶¶ 20–21.  When he requested medical attention, officers told him that "no one's

there."  *Id.* at 4 ¶ 24.  MDC staff also ignored Williams's repeated requests to see

mental health staff during the week of the Conditions Crisis before informing him

that they could not fulfill his request because mental health professionals would not

be available on weekends.  *Id.* at 5 ¶ 25.

While the OIG was unable to "evaluate the efficacy of medical care provided

to a particular inmate or the population as a whole," its report documented a missed

insulin delivery and two missed medication deliveries.  OIG Rep. at 28.  The OIG

also found that 15 residents who used Continuous Positive Airway Pressure (CPAP)

machines were unable to do so because of the power outage.  *Id.* at 29.  One resident

"with an open wound" showed the Federal Defenders representative his "puss-

covered bandages that hadn't been changed in two weeks."  Patton Testimony at 3.

## II.    DISCUSSION

Plaintiffs seek to certify a class "consisting of [] all those people who were

confined in the Metropolitan Detention Center's West Building . . . from January 27,

2019 until February 3, 2019, and who have or will in the future have satisfied the exhaustion requirement imposed by [the FTCA]." ECF No. 131 at 1–2. Plaintiffs bear the burden to show compliance with all of Rule 23's requirements, and a "district court may certify a class only after determining that each Rule 23 requirement is met" by conducting its own "rigorous analysis." *Lisnitzer v. Zucker*, 983 F.3d 578, 588 (2d Cir. 2020); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013). Compliance must be shown by a "preponderance of the evidence." *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation omitted). At the certification stage, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466.

Rule 23(a) requires that the party seeking certification make prerequisite showings of (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *In re Petrobras Secs.*, 862 F.3d 250, 260 (2d Cir. 2017). The Second Circuit has also held that Rule 23 contains "an implied requirement of ascertainability," the touchstone of which is "whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (internal quotation omitted).

Plaintiffs must also demonstrate that the proposed class fits one of the categories of class actions that may be maintained under Rule 23(b). *Comcast*, 569 U.S. at 33. Rule 23(b)(3), the category plaintiffs rely on, requires them to show that "[1] questions of law or fact common to class members predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The first part of this test is usually referred to as the "predominance" requirement, while the second is known as the "superiority" requirement. *See In re Petrobras*, 862 F.3d at 260; *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013).

## A. *Ascertainability*

The implied requirement of ascertainability tests whether a class is "defined by objective criteria that are administratively feasible [such that] identifying its members would not require a mini-hearing on the merits of each case." *Brecher*, 806 F.3d at 24–25 (internal quotation omitted). This is not a heavy burden because the requirement is "designed only to prevent the certification of a class whose membership is truly indeterminable." *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014) (Rakoff, *J.*) (internal quotation omitted).

The proposed class is ascertainable. Membership is governed by the objective criteria of (1) incarceration at the MDC's West Building during the Conditions

Crisis, and (2) exhaustion under the FTCA. Defendants have easy access to both pieces of information and have already been ordered to turn some of it over to plaintiffs. *See* ECF No. 59 at 2 (reporting that nearly 1,700 individuals were housed in the West Building during the Conditions Crisis and that defendants had compiled a list of most of their names); ECF No. 83 (protective order governing discovery of address information for those individuals). It will therefore be administratively feasible to "determine whether a particular individual is a member" of the class. *Brecher*, 806 F.3d at 24.

B. *Fed. R. Civ. P. 23(a) Prerequisites*

1. *Numerosity*

Rule 23(a)(1) requires that the movant show that "the class is so numerous that joinder of all members is impracticable." In the Second Circuit, impracticability of joinder, and thus numerosity, "is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Plaintiffs contend that the proposed class includes approximately 1,600 members. ECF No. 131-1 at 19. Defendants determined that "approximately 1,694" individuals were housed in MDC'S West Building during the Conditions Crisis, and they concede that this requirement is met. ECF No. 131-10 at 7. Plaintiffs' attorney also filed an omnibus administrative claim on behalf of 573 putative class members. ECF No. 131-7 at 5 ¶ 10. Accordingly, plaintiffs have demonstrated numerosity.

## 2. *Commonality*

Rule 23(a)(1) requires that there be "questions of law or fact common to the class." The movant must demonstrate that there is a common contention that can "drive the resolution of the litigation" because "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation omitted); *see also Sykes v. Mel S. Harris & Assocs.*, 780 F.3d 70, 84 (2d Cir. 2015). Raising questions that touch many claims is not enough; rather, the critical issue is whether there are common questions that demonstrate "the capacity of a class-wide proceeding to generate common *answers*" bearing on the claims of the class members. *Wal-Mart*, 564 U.S. at 350 (emphasis in original) (internal quotation omitted). Only one such common question is needed to "unite all of the plaintiffs' claims" and satisfy commonality. *Id*. at 359 & n.10.

The commonality requirement is met here. The heart of this case is the common negligence claim against defendants. Plaintiffs point to several factual and legal contentions the resolution of which will generate common answers "central to the validity of each of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Common factual issues raised by the complaint include (1) whether defendants were aware of the need to maintain MDC's infrastructure but failed to do so, (2) whether defendants developed and implemented an adequate emergency response plan,

(3) what emergency measures defendants took or failed to take during the Conditions Crisis, (4) whether those acts or omissions exposed people incarcerated at MDC to a substantial risk of serious harm, and (5) whether defendants knew of and disregarded that risk. *See* ECF No. 29 at 52. The resolution of these issues will in turn bear on the ultimate factual question of whether defendants' conduct before and after the power outage breached the duty of care owed to class members while they were incarcerated at MDC and therefore constituted negligence.

Defendants' arguments to the contrary miss the mark. They argue that it "cannot be assumed that each individual . . . experienced a breach of a cognizable duty of care or that, if so, he sustained an injury . . . and that a breach of that duty was the proximate cause of any injury." ECF No. 131-10 at 9. The question at this stage is not whether these elements can be assumed or established, but rather whether a class-wide proceeding can resolve them in a way that generates common answers bearing on each of the claims raised by class members.

I conclude that it can. Plaintiffs' claims arise from conditions that applied to them in uniform or similar ways, and which they allege were caused by defendants' policies, acts, and omissions. *See supra* Part I (summarizing plaintiffs' evidence of West Building conditions). To give some possible examples among many, a negative answer to the question of "whether defendants in fact failed to provide adequate clothing, heat, and hot water to people incarcerated in the MDC's West Building

during the power outage" would resolve all claims related to that conduct "in one stroke." *Wal-Mart*, 564 U.S. at 350. Similarly, a negative answer to the question of "whether defendants breached the duty of care owed to those in their custody by failing to remedy these conditions" would cause the same result. Several such questions feature in this case, and the commonality prerequisite is accordingly satisfied.

### 3. *Typicality*

Rule 23(a)(3) requires the movant to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (internal quotation omitted). Commonality and typicality "tend to merge into one another, so that similar considerations animate analysis" of both prerequisites. *Id.* "[M]inor variations in the fact patterns underlying the individual claims," *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993), will not defeat typicality where "plaintiffs allege that their injuries derive from a unitary course of conduct by a single system." *Marisol A.*, 126 F.3d at 377.

Typicality is satisfied here for much the same reason commonality is: plaintiffs allege that defendants violated duties owed to them as a class. The alleged

violations, such as failure to adequately respond to the power outage or to take reasonable steps to ameliorate conditions presenting risks of substantial harm to West Building residents, occurred "in a manner common to the plaintiff class." *Marisol A.*, 126 F.3d at 377. All the alleged violations resulted from the action or inaction of MDC and BOP officials charged with ensuring the care and safety of those incarcerated in the facility's West Building. Even assuming that there are minor variations in how these alleged violations affected individual claimants, that would not be enough to conclude that the lead plaintiffs' claims are atypical of the proposed class.

Defendants argue that typicality is absent here because plaintiffs have satisfied the FTCA's exhaustion requirement, while some members of the proposed class have allegedly not yet done so. They claim that these "differences in the legal claims are fatal to Plaintiffs' typicality argument." ECF No. 131-10 at 10. But the proposed class definition makes clear that it includes only those claimants "who have or will in the future have satisfied the exhaustion requirement imposed by [the FTCA]." ECF No. 131 at 1–2. The typicality problem identified by defendants is illusory because anyone who fails to exhaust is automatically defined out of the class. Moreover, plaintiffs have already exhausted under the FTCA, and thus there is no danger that they will prioritize overcoming an atypical exhaustion-related defense ahead of the common interests of the class. ECF No. 131-2 at 6 ¶ 38; *see also Baffa*

*v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (explaining that the typicality inquiry is animated in part by "danger that absent class members will suffer if their representative is preoccupied with defenses unique to her").

The parties also spar over whether those claimants who have not exhausted would be eligible for some form of tolling, either as equitable relief or because plaintiffs tolled the FTCA's administrative period on behalf of all putative class members by filing this action. *See Am. Pipe. & Constr. Co. v. Utah*, 414 U.S. 538, 552–53 (1974). I decline to resolve the dispute at this stage. Claimants who ultimately fail to exhaust under the FTCA—for whatever reason—will not be part of the certified class. Whether additional claimants are eligible for some form of tolling that would allow them to exhaust in the future is outside the scope of this motion for certification.

### 4. *Adequacy*

Rule 23(a)(4) requires movant to show that "the representative parties will fairly and adequately protect the interests of the class." This prerequisite "serves to uncover conflicts of interest between named parties and the class they seek to represent" because such conflicts would undermine the lead plaintiffs' incentives to vigorously advocate on behalf of the class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "Determination of adequacy typically 'entails inquiry as to

whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (quoting *Baffa*, 222 F.3d at 60). Only "fundamental conflicts" will render a representative inadequate, *Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013), and even some fundamental conflicts that go to "to the very heart of the litigation" may be cured by dividing a class into subclasses. *Id.* at 250 (internal quotation omitted).

Lead plaintiffs have shown that they will fairly and adequately protect the interests of the class. Both "assert claims arising out of the same conduct and resulting in the same type of injuries" as members of the proposed class. *B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, 2018 WL 1335355, at *9 (E.D.N.Y. Mar. 14, 2018). At this stage, there is no conflict between the interests of lead plaintiffs and the interests of class members, much less a fundamental one. Defendants raise the same objection to adequacy as they did to typicality, arguing that lead plaintiffs cannot adequately represent claimants who have not exhausted under the FTCA. For the reasons discussed above, that argument is unpersuasive.

Proposed class counsel are experienced and competent lawyers who will be able to conduct this litigation. The proposed class is represented by the law firm Emery Celli Brinckerhoff Abady Ward & Maazel LLP (Emery Celli), the Benjamin

N. Cardozo Civil Rights Clinic and its Director Betsy Ginsberg, and Cardozo School of Law professor Alexander Reinert. Together, these attorneys have extensive experience litigating civil rights actions and class actions in federal court. *See* ECF No. 131 Exs. F–H; *Rosenfeld v. Lenich*, 2021 WL 508339, at *5 (E.D.N.Y. Feb. 11, 2021) (finding that Emery Celli has "a wealth of experience handling complex class actions"); *McBean v. City of New York*, 260 F.R.D. 120, 132 n.17 (S.D.N.Y. 2009) (finding that Emery Celli "amply demonstrate[d]" its "ability and determination to represent the class effectively"); *Brown v. Kelly*, 244 F.R.D. 222, 233 (S.D.N.Y. 2007), *aff'd in part, vacated in part on other grounds*, 609 F.3d 467 (2d Cir. 2010) (describing Emery Celli as "a preeminent civil rights firm."). In addition, their briefing on this motion was of high quality and demonstrated command of the law and attention to detail. Defendants do not argue that proposed class counsel would be unable to effectively advocate for, and manage this litigation on behalf of, the proposed class. *See* ECF No. 131-10 at 15–17. Accordingly, I find that proposed class counsel will fairly and adequately represent the interests of the proposed class.

C. *Fed. R. Civ. P. 23(b)(3) Requirements*

Plaintiffs have satisfied all the prerequisites to class certification. I now turn to the additional requirements they must show to maintain a class action under Rule 23(b)(3).

1. *Predominance*

Rule 23(b)(3) provides that a court must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members." Predominance turns on whether the class's interests are "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. The predominance requirement is similar to the commonality prerequisite, but it is "even more demanding." *Comcast*, 569 U.S. at 34. "In order to meet the predominance requirement . . . a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006) (internal quotation omitted).

I begin by examining "the elements of the claims and defenses to be litigated." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015). The FTCA allows tort claims for negligence against employees of federal agencies if a private person would be liable in the same circumstances under the laws of the place where the conduct occurred. *See* 28 U.S.C. § 2672. The state law negligence analogue here requires plaintiffs to "demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Pasternack v. Lab'y Corp. of Am. Holdings*, 27 N.Y.3d 817, 825 (2016) (quoting

*Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985)). The definition and scope of a duty is a question of law. *Id.*

I find that the central—and predominating—issues in this case are (1) the scope of the duty of care defendants owed to people incarcerated in the West Building at MDC during the Conditions Crisis, (2) whether defendants breached that duty, and (3) whether they thereby injured plaintiffs. Plaintiffs assert that defendants breached their duty of care and created "an unreasonable risk of serious damage to Plaintiffs' and the Class members' health and physical and mental soundness." ECF No. 29 at 56. The alleged breach was the same for all class members: failing to take adequate measures to respond to the power outage or remediate the dangerous conditions that were "open and obvious" in its aftermath. *Id.*

Similarly, many of the injuries allegedly flowing from the breach—e.g. loss of light and heat, exposure to near-freezing temperatures, long-term confinement in cells, and deprivation of communication with families and lawyers—impacted class members generally. *See supra* Part I; ECF No. 29 at 56–57. In other words, these claims all involve allegations of negligence against the same actors, arising from the same conduct, affecting claimants who were all housed in the same building at the same time in the same or similar ways. These issues are thus "susceptible to generalized, class-wide proof," and resolving them on a class-wide basis "would achieve economies of time, effort, and expense, and promote uniformity of decisions

as to persons similarly situated." *In re Nassau Cnty.*, 461 F.3d at 225, 227 (internal quotation omitted). Resolving the truth and extent of defendants' wrongdoing will be useful to the class as a whole.

Some plaintiffs may have suffered unique injuries in addition to those experienced by the class, so individual damages issues may present themselves in this case if liability is established. However, I find that those issues will not predominate over the common duty, breach, and injury questions. "Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *Sykes*, 780 F.3d at 81 (internal quotation omitted). And "[t]here are a number of management tools available to a district court to address [these] issues" should they arise, including trial bifurcation, assignment to a magistrate judge or special master for damages calculations, or decertification and notice after a liability determination. *In re Nassau Cnty.*, 461 F.3d at 231 (internal quotation omitted).

### 2. *Superiority*

Superiority requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The rule provides that the following factors should be considered:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.*; *In re Nassau Cnty.*, 461 F.3d at 230. This list is not exhaustive. *Amchem*, 521 U.S. at 615–16. Defendants mention the superiority requirement but do not argue that plaintiffs fail to meet it. *See* ECF No. 131-10 at 17–19. Nevertheless, I engage in the required "rigorous analysis," *Lisnitzer*, 983 F.3d at 588, and conclude that all four factors weigh in favor of finding superiority.

a. *Interest in Individual Control*

The first factor examines the interest individual class members hold in controlling the course of their own actions. The preference for individual control reflects our "deep-rooted historic tradition that everyone should have his [or her] own day in court," to which representative litigation is an exception. *Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008) (internal quotation omitted). That preference may be outweighed in some cases, such as where the possible recovery for each individual complainant is small relative to the cost of litigation. *Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (internal quotation omitted).

That is the case here, where the potential recovery for each individual claimant is likely to be small relative to the cost and complexity of litigating those claims against the federal government. That is particularly true because the proposed class is composed of incarcerated or recently incarcerated people, who are likely to lack the resources or legal training to vindicate their rights. *See Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 813 (1985) (use of the class action device is appropriate where "[t]he plaintiff's claim may be so small, or the plaintiff so unfamiliar with the law, that he [or she] would not file suit individually."); *Amchem*, 521 U.S. at 616.

b.    *Other Pending Litigation*

Analysis of the second factor reinforces the conclusion that potential class members lack significant interest in maintaining separate actions. Of the approximately 1,600 prospective class members, only a handful have filed their own suits. One of those cases was dismissed because the plaintiff failed to prosecute, and another resulted in a stipulated dismissal. *See* ECF No. 28, *Alicea v. Quay,* 19-cv-2135-MKB-PK (E.D.N.Y. July 8, 2020); ECF No. 29, *Saeed v. Quay*, 19-cv-2134-MKB-PK (E.D.N.Y. Jan. 14, 2021). Plaintiffs report that "many of the plaintiffs who filed related lawsuits have voluntarily dismissed those cases to join this action as putative class members." ECF No. 131-1 at 31. Plaintiffs in the two remaining cases were given a chance to oppose consolidation of their actions with this one, and none did so. The "small number of individual suits against defendants . . . indicat[es]

a lack of interest in individual prosecution." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 309 (3d Cir. 2005). Finally, class members who do retain such an interest will have the opportunity to opt out of the class. *See* Fed. R. Civ. P. 23(c)(2)(B)(v).

### c.   *Desirability of Concentration*

The third factor is easily satisfied. MDC is located in this district, and "all pending litigation arising from the fire [and power outage] is apparently before this court." *Beaulieu v. EQ Indus. Servs., Inc.*, 2009 WL 2208131, at *23 (E.D.N.C. July 22, 2009). Aggregating these claims will promote judicial economy and uniformity of decisions by "simplify[ing] and streamlin[ing] the litigation process." *In re Nassau Cnty.*, 462 F.3d at 230. Moreover, this action has already "progressed substantially" through the discovery process on factual issues common to the class. *Id.*

### d.   *Manageability*

The fourth factor focuses on whether class action litigation would be manageable under the circumstances. "[F]ailure to certify an action . . . on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *In re Petrobras Secs.*, 862 F.3d at 268 (internal quotation omitted). I find that there are no significant manageability challenges present in this case. To the contrary, litigating the claims in this case on a class basis is likely to be more efficient and manageable than handling them individually. As discussed above,

the predominant issues of law and fact affecting each plaintiff's claims are either similar or identical. To the extent that unforeseen issues do arise, they can be addressed using normal trial management tools. *Id.* at 274.

### III.  CONCLUSION

Plaintiffs have demonstrated that the proposed class is ascertainable and complies with the Rule 23(a) prerequisites. They have also shown compliance with the requirements to maintain a class pursuant to Rule 23(b)(3). Accordingly, a class consisting of all those people who were confined in the Metropolitan Detention Center's West Building from January 27, 2019 until February 3, 2019, and who have or will in the future have satisfied the exhaustion requirement imposed by 28 U.S.C. § 2675, is certified. Plaintiffs' counsel is appointed class counsel in light of the work they have already done on this case, as well as their experience, knowledge, and resources. *See* Fed. R. Civ. P. 23(g)(1).

                                        **SO ORDERED.**

                                        *Edward R. Korman*
Brooklyn, New York                      Edward R. Korman
May 25, 2021                            United States District Judge