# Exhibit 1

# After Action Report

After Action Report

# Partial Electrical and Reported Heating Outage Civil Disturbance

Metropolitan Detention Center
Brooklyn, New York



**Submitted by:  J. Ray Ormond, Regional Director**

BOP AFTER ACTION REPORT 001

## TABLE OF CONTENTS

Introduction/Executive Summary...............................3-5

Chronology of Events........................................5-16

Analysis of Events.........................................17-28

Conclusions..................................................28

Recommendations...........................................28-29

Inmate Information...........................................30

Cost/Impact Statement........................................30

**Introduction**:

The Metropolitan Detention Center (MDC) in Brooklyn, New York, is an Administrative Level facility that serves the Eastern and Southern Districts of New York.  The primary mission of the facility is to house pre-trial inmates awaiting court action for the United States Marshals Service (USMS).

On February 8, 2019, the Northeast Regional Director appointed an After Action Review (AAR) Team to review a series of events that occurred at the MDC between the dates of Sunday, January 27, 2019 to Sunday, February 3, 2019.  The review was conducted to analyze the events that led to mechanical system failures resulting in the partial loss of electricity and reported loss of heat to the institution, along with an examination of existing practices and procedures that contributed to a subsequent Civil Disturbance.

The review team consisted of:

Andre Matevousian, Complex Warden, FCC Florence
Louis Milusnic, Complex Warden, FCC Victorville
Jeffrey Greene, Associate Warden, FDC Seatac
Victor Moreno, Associate Warden, USP Atlanta
Steve Reiser, Associate Warden, FCC Coleman
Darrin Howard, Regional Counsel, Northeast Regional Office
Tovia Knight, Public Affairs Specialist, Central Office
Dr. Te Core Ballom, RADM Medical Director, South Central Region
Marc Wolff, Chief Facilities Programs, Central Office
Neil Morgan, Facilities Manager, FDC Philadelphia
James Gibbs, Correctional Services Specialist, Northeast Region
Michael Drake, Emergency Management Specialist, Central Office

The review was conducted on March 5-8, 2019.

**<u>Executive Summary</u>:**

On Sunday, January 27, 2019, at 12:50 p.m., a fire alarm was activated in the second floor mechanical room.  An immediate response to the area revealed a fire that resulted in loss of power to one of the main priority switches that services approximately sixty-six (66) electrical panels throughout the West building.

The New York City Fire Department (NYFD), responded to the institution and extinguished the electrical fire and coordinated with Con Edison (electrical service provider) to isolate the power feed to the damaged priority switch.  Based on the impact of the fire and the loss of power that resulted in security concerns, the facility was placed on lock-down status to assess the damage and make emergency repairs.

Over the next week, concerns were voiced by inmates and external stakeholders regarding the reported conditions of confinement at the MDC.  Specifically, the majority of concerns surrounded reports of limited access to medical care, lack of adequate heat and electricity in cells, access to legal visits and calls, and a lack of transparency regarding the status of repairs and current living conditions.

As a result, public concern was voiced to the media, local government officials, courts, and members of Congress.  As part of the review, the AAR team identified over seven (7) visits from twenty-four (24) officials to the MDC during the incident period who sought to observe and inquire into the incident and be briefed on the course of actions being taken to remedy their concerns.  Most notably, the Chief United States District Judge, Eastern District of New York, ordered that a representative of the Federal Defenders of New York and the U.S. Attorney's Office, Eastern District of New York be permitted to inspect each housing unit in the West Building and speak directly with inmates on February 1, 2019.  Additionally, U.S. Congressional members toured the facility on Friday (2/1), Saturday (2/2), Sunday (2/3), and Monday, (2/11).

During the course of the week, the institution operated on a variety of schedules, from modified operations to full lock down procedures.  As a result, normal services the MDC provides to the inmate population, courts, and the public were suspended or delayed.

Based on community concerns regarding reported living conditions, a large gathering of protestors converged on the MDC for several days.

On Sunday, February 3, 2019, the large gathering of approximately 50 to 60 protesters (based on video footage) entered the main lobby of the MDC and engaged in a physical confrontation with staff.  After attempts to contain the protestors and after being pushed back into the lobby by protestors, employees utilized physical force to remove the protestors from the institution.  During the confrontation, staff deploy chemical agents in an effort to limit injury to both staff and protestors, and to remove the protestors from inside the institution's main lobby.  This action proved effective and staff were able to remove all individuals from the institution without further incident.

On Sunday, February 3, 2019, at approximately 6:30 p.m., emergency repairs were finalized on the priority switch gear that was destroyed in the fire and power was fully restored to all areas of the institution.

**Chronology of Events**:

**Friday, January 4, 2019**

6:30 a.m.: The West building sustains power loss and the Facilities Department staff activated the generators without delay.  The uninterrupted power supply (UPS) system immediately activated emergency lighting throughout the affected areas, which included unit common area lights.  An examination of the core problem is isolated to a breaker impacting priority switch gear #3

**Saturday, January 5, 2019**

1:30 a.m.: An outside electrical contractor is called into the facility to examine the electrical power issues with switch gear #3. During this time, all three (3) generators fail and no longer start, resulting in no back-up power to the facility. At this time, the institution has power to all areas with the exception of inmate cells, phones and computers, and food services.

5:00 p.m.: The electrical contractor is successful in reestablishing power to switch gear #3 and utility power is restored to the affected areas described in the 1/5/19 1:30 a.m. outage.  The contractor report indicates he checked the breaker, verified all connections

were made within the gear, no bus or wires were shorted, all connections within the gear were installed and secured, and none of the stabs (generator breaker connection point) had anything loose within the gear. The breaker was reinstalled.  However, all three generators are still inoperable and institution staff work with a local generator contractor to install an emergency generator.  The institution rented a generator on January 5, 2019, and it was returned January 17, 2019.  The institution returned to normal operations at 5:35 p.m.

**Monday, January 7, 2019**

7:00 a.m.: Electrical and generator contractors arrive at MDC to install temporary lines and continue to troubleshoot institution generators.

**Tuesday, January 8, 2019**

10:30 a.m.: Temporary generator installed and connected to second floor electrical room.

**Thursday, January 10, 2019**

1:30 p.m.: Generator contractor repairs all three institution generators by replacing the diodes, which are essentially, fuses.

**Monday, January 21, 2019**

During the early morning hours, after outside temperatures drop to 3 degrees, multiple heating coils in the HVAC system freeze and burst, resulting in loss of heat to eight (8) of the fifteen (15) main systems in the West building.  These areas and dates of repairs are noted below.

1. AHU 4-1 (Unit G43 Common Areas) - Repaired 1/22/19
2. AHU 4-6 (Unit G42 Cells) - Repaired 1/22/19
3. AHU 6-6 (Unit I62 Cells) - Repaired 1/22/19
4. AHU 7-3 (Unit J72 Common Areas) - Repaired 1/23/19
5. AHU P-1 (SHU Range 3) - Repaired 1/22/19
6. AHU P-3 (SHU Office Areas / Unit Team Offices floors 4-9) Repaired 1/23/2019.  Staff provided alternative work areas.

7. AHU 2-9 (Medical Department) – Repaired 1/22/19
8. AHU 3-2 (Food Services) – Repaired 1/22/2019

6:00 a.m.: Power to priority switchgear #3 fails, resulting in loss of power to multiple areas in the West building, to include inmate cells, phones and computers, and food services.  Con Edison Command Center contacted and reported two feeder cables inoperative.  Con Edison dispatches staff to MDC.

8:00 a.m.: Con Edison arrives at the MDC to assess the loss of power and discovers a malfunctioning 5000 amp fuse located in the utility providers high voltage network room of the West building. MDC staff do not have access to the utility provider's room as it is owned and restricted by the utility company.

2:00 p.m.: Repairs are finalized by Con Edison and power is restored.


**Tuesday, January 22, 2019**

4:25 p.m.: Warden reports to Regional Director heat restored to Special Housing, Food Services, Education, Health Services, Unit 52, Unit 72.  Staff continue working on Unit 62.  Part has been ordered for Unit Team Staff work areas.

8:13 p.m.: Warden reports to Regional Director Facilities Department Staff have been working on heating coils entire day and will continue repairs next day.  Additional blankets have been provided in all affected units.


**Wednesday, January 23, 2019**

2:55 p.m.: Temperature readings in all units range between 64 and 78, with the exception of Unit 62.  Staff working on Unit 62 heating coil and provided inmates with additional linens.

6:12 p.m.: Warden reports to Regional Director heat restored to Unit Team Staff work areas.

**Thursday, January 24, 2019**

4:30 p.m.:  Warden reports to Regional Director he walked the institution with Local Union President and measured temperatures in each area, which reflected temperatures between 63 and 74 degrees.

**Sunday, January 27, 2019**

12:50 p.m.: Fire alarm activates in second floor mechanical room.

12:51 p.m.: Institution placed on lock down status and NYFD dispatches to MDC.  Visiting room evacuated.

12:57 p.m.: NYFD arrives to MDC.

1:53 p.m.: NYFD fully extinguishes fire and renders building safe.

2:00 p.m.: NYFD Fire Marshal and utility provider Con Edison conduct fire inspection.

2:21 p.m.: NYFD exits building.

2:42 p.m.: NYFD exits property.

4:30 p.m.: Facilities staff replace smoke detector in second floor mechanical room and begin assessing damage to priority switch gear #3.  Staff begin to establish emergency lighting throughout the facility.

5:02 p.m.: Warden provides synopsis to Regional Director of day's activities.  Warden indicated: 1) No staff or inmate injuries, 2) East Building (female inmate housing) is unaffected, 3) Power unavailable in staff offices, inmate cells, food services, receiving and discharge area, and visiting.  Computers are not operational. 4) Power outage did not impact cameras, housing unit common area lighting, institution heat, or elevator operations.  5) Institution will remain secured (lock down) and inmates will receive evening meals in assigned cells, 6) Medical staff are conducting pill line in each unit and going to each cell to address inmate concerns, 7) Visiting has been cancelled, Con Edison was on site today to evaluate outage and will return 1/28/19 to bypass damaged switch gear.

**Monday, January 28, 2019**

8:00 a.m. – Con Edison arrives on site to confirm power has been isolated to priority switch gear #3 and discovers following an inspection, severe damage to the electrical cabinet and three (3) bad 5000 amp fuses. Due to fire damage, institution generator and portable generator cannot provide service to priority switch gear #3 until bypass electrical panel is installed.

1:00 p.m. – Electrical contractor arrives to assess and evaluate replacement of priority switch gear #3 cabinet.  The contractor was contacted January 27, 2019, but could not begin work until the area was determined safe, on January 28, 2019, by the utility provider.

5:04 p.m.: Warden provides synopsis of day's activities.  Warden indicated: 1) the January 4, 2019, and January 27, 2019, power interruptions were on the same switch gear #3, but were not in the same area and the January 27, 2019 fire did not damage the January 4, 2019, reinstalled breaker.  2) Temporary lighting was placed in food services for preparation of hot meals, lighting and computers are working in health services, temporary lighting placed in receiving and discharge area for processing of inmates.  3) Inmates have been out of their cells since lunch, with access to unit common areas, outdoor recreation, showers, and hot water dispensers.  4) Currently, no lighting in the visiting room and visits remain suspended.  5) A second staff member was added to each housing unit, and units will be secured at 8:00 p.m. 6) Electrical contractor was at the institution all day testing impacted areas for needed repairs.


**Tuesday, January 29, 2019**

9:55 a.m.: Housing Units return to normal operation, allowing inmates access to unit common areas, showers, outdoor recreation, and hot water dispensers.  Additional staff assigned to each unit to assist assigned Officer.  Visitation remains cancelled due to no lighting in Visiting Room.

Structural engineering firm Miller-Remick arrives to MDC to conduct assessment of electrical fire and damage.  Purpose of the visit is to provide design recommendations to replace damaged switch gear and make recommendations to prevent similar events in the future.

**Wednesday, January 30, 2019**

Housing Units remain in normal operation, allowing inmates access to unit common areas, showers, outdoor recreation, and hot water dispensers.   Additional staff assigned to each unit to assist assigned Officer.  Visitation remains cancelled due to no lighting in Visiting Room.


9:27 a.m.: Institution receives Miller-Remick Engineering Field Report.  Report indicates more test are planned before attempting to re-energize emergency feeds, and provides phases of work that will continue for restoring power.

Contractor continues work on installation of new temporary main disconnect and removal of damaged wires from switchgear cabinet for connection of new equipment.


**Thursday, January 31, 2019**

Housing Units remain in normal operation, allowing inmates access to unit common areas, showers, outdoor recreation, and hot water dispensers.   Additional staff assigned to each unit to assist assigned Officer.  Visitation remains cancelled due to no lighting in Visiting Room.

3:50 p.m.: Warden reports to Regional Director all units temperatures are between 66 and 75, with the exception of one unit (53.4). Adjustments were made to the air handler of this one unit. Outside temperatures on January 31, 2019, range between 2 and 17.

Electrical contractor submits work ticket to Con Edison to schedule power restoration.  Contractor continues work on installation of new temporary main disconnect and removal of damaged wires from switchgear cabinet for connection of new equipment.


**Friday, February 1, 2019**

Housing Units remain in normal operation, allowing inmates access to unit common areas, showers, outdoor recreation, and hot water dispensers.   Additional staff assigned to each unit to assist assigned Officer.  Visitation remains cancelled due to no lighting in Visiting Room.

6:00 a.m.: Temperature readings in all units range between 63.8 and 74. Outside temperatures on February 1, 2019, range between 10 and 22.

9:35 a.m.: Staff call for assistance; inmates refuse to return to assigned cells.

12:00 p.m.:  Elevators become inoperable and inmates returned to their assigned cells.  Some inmates become disruptive and refuse; others become disruptive inside cells, kicking doors, covering windows, setting fire.

1:30 p.m. Bureau of Prisons becomes aware of New York Times article, titled "No Heat for Days at Jail in Brooklyn Where Hundreds of Inmates Are Sick and 'Frantic'".

2:10 p.m.: Staff call for assistance; inmate becomes disruptive while being escorted by staff.

3:00 p.m.: Temperature readings in all units range between 66 and 74. Outside temperatures on February 1, 2019, range between 10 and 22.

3:45 p.m.: Visit by Thomas E. Mixon, Assistant District Executive, United States District Court, Southern District of New York.  Warden reports to Regional Director they toured three floors of units, inspected the temperatures, appeared to be satisfied with the temperatures, and asked to see the kitchen, at which time he viewed hot meals being prepared.

4:10 p.m.: Visit by Nydia Velazquez, U.S. Representative, New York 12th District; Dan Wiley, Director for Representative Velazquez; Melissa Ortiz, Community Relations Director, for Representative Velazquez. Warden reports to Regional Director they toured eight units and Special Housing Unit.  Appeared satisfied with unit temperatures but concerned with temperatures in sally port area of each floor (no staff or inmates assigned) and front lobby of building. Inspected the water temperature of showers on each floor visited and appeared satisfied with the results.

4:10 p.m.: Visit by John Ross, Senior Investigator, U.S. Attorney's Office; Deirdre Von Dornum, Attorney-in-Charge, Federal Public Defenders Office, Eastern District of New York.  Warden reports inmates told Ms. Von Dornum they were not receiving medication, told

her they were locked in cells all week.  Inmate in SHU told Ms. Von Dornum he was freezing, but was not wearing a shirt.  Ms. Von Dornum reported she would be writing to the Court that evening.

4:47 p.m.: Warden reports to Regional Director electrical contractor continues to work on installation of new electrical panel.

5:56 p.m.: Staff call for assistance; inmate assault on staff.

Multiple groups of activist post notices of planned protest at MDC on February 2, 2019, at 12:00 p.m., titled "Until There is Heat" and "Occupy For Humanity".  Unit temperatures are ranging between 66 and 74.


**Saturday, February 2, 2019**

12:00 a.m.: Inmates cover cell windows, preventing staff from conducting official count and ensuring the health of the cells occupants.  One employee was injured while removing the inmates from their cell.

8:40 a.m.: New York Police Department (NYPD) notified institution regarding anticipated protest at MDC.

9:00 a.m.: Institution placed on lock down status as a result of inmate activities on February 1, 2019 and February 2, 2019, and anticipated protest at the MDC.

10:00 a.m.: Groups of protestors arrive outside institution and inmates begin covering cell door windows and pounding on outer windows.

11:00 a.m.: The size of the protest group increases and staff report protesters are inciting inappropriate behavior by inmates.

11:55 a.m.: MDC Brooklyn Disturbance Control Team (DCT) activated.

12:00 p.m.: Temperature readings in all units range between 65 and 80.

1:04 p.m.: Protesters attempt to breach the West Lobby, emergency response staff block egress and contain individuals from accessing the building.

1:20 p.m.:  Staff begin institution tours:
Jerrold Nadler, U.S. Representative, New York 10th District;
Robert Gottheim, Director of Relations for Representative Nadler.

Antonio Delgado, U.S. Representative, New York 19th District

Hakeem Jefferies, U.S. Representative, New York 8th District

Nydia Velazquez, U.S. Representative, New York 12th District;
Dan Wiley, Director for Representative Velazquez; Melissa Ortiz,
Community Relations Director, for Representative Velazquez.

Deirdre Von Dornum, Attorney-in-Charge, Federal Public Defenders
Office, Eastern District of New York

Letitia James, Attorney General for the State of New York

Jo Anne Simon, New York State Assembly, 52nd District

Brad Lander, New York City Council, 39th District

Scott Stringer, Comptroller, New York City

Jumaane Williams, Former New York City Council, 45th District

2:30 p.m.: Protesters access the staff parking lot and engage
responding staff in a verbal confrontation.  Staff are able to escort
individuals off of government property without further incident.

6:45 p.m.: As staff where preparing to transport an inmate to the
local hospital, protesters blocked the 2nd Avenue gate to prevent an
ambulance from entering the institution.  Emergency response staff
were able to move the protesters back onto the street without further
incident.

Contractor continues work on installation of new temporary main
disconnect and removal of damaged wires from switchgear cabinet for
connection of new equipment.


**Sunday, February 3, 2019**

6:00 a.m.: Bureau of Prisons and Contract staff return to institution
to continue electrical service work. This work included installing
temporary service to switchgear #3 and making final electrical

termination to the new temporary switchgear.

10:30 a.m.: Temperature readings in all units range between 67.6 and
77. Outside temperatures on February 3, 2019, range between 24 and
53.

12:29 p.m.: Two units returned to normal operation.  These units were
not being disruptive and the institution determined it appropriate
to return these units to normal operation.

12:40 p.m. Protesters breach the West lobby and engage staff in a
physical altercation.  Responding staff utilize physical force and
chemical agents to successfully remove the individuals.  Seventeen
staff are injured as a result of this activity.

1:00 p.m.: All Units returned to lock down status.

2:00 p.m.: Staff begin institution tours:
Nydia Velazquez, U.S. Representative, New York 12th District;
Dan Wiley, Director for Representative Velazquez; Melissa Ortiz,
Community Relations Director, for Representative Velazquez.

4:08 p.m.: Protesters breach the 2nd Avenue gate. Responding staff
are able to remove the individuals without incident.

5:00 p.m.: Staff begin institution tour:
Richard R. Donoghue, U.S. Attorney, Eastern District of New York

6:30 p.m.: Emergency repairs finalized on the priority switch gear
destroyed in the fire and power fully restored to all areas of the
institution.  All units return to normal operation.

The following Crisis Management Teams were activated: USP Canaan
Special Operations Response Team (SORT) – 19; MCC New York DCT – 10

**Monday, February 4, 2019**

7:00 a.m.: Protesters remain in front of institution.

8:00 a.m.: Legal Visiting schedule resumes.

10:45 a.m.: Bomb threat called into MDC. All visitors to the
institution were removed and institution was secured for an emergency
count.  Law enforcement officials were notified and staff began to

methodically search the interior and exterior of the institution.

1:50 p.m.: Bomb threat cleared.

2:00 p.m.: Institutions resumes normal operations, allowing inmates access to unit common areas, showers, outdoor recreation, and hot water dispensers.  Visitation for legal and social visits resume normal operation.

5:00 p.m.: FBI reports to institution.  Notifies Warden of death threats identified towards the following staff: Warden, Associate Warden, and Correctional Officer.

6:00 p.m.: Nydia Velazquez, U.S. Representative, New York 12th District; Dan Wiley, Director for Representative Velazquez; Melissa Ortiz, Community Relations Director, for Representative Velazquez, visit MDC Brooklyn.

Institution reports NYPD places barricades in front of the MDC entrance; time of placement not documented.


**Tuesday, February 5, 2019**

7:00 a.m.: Protesters remain in front of institution, however, institution is operating under normal procedures, providing inmates access to all areas of unit, medical, and programming activities.

11:30 a.m.: Institution documentation reflects Command Center activated.

5:10 p.m.: Staff begin institution tour:
Analisa Torres, U.S. District Judge, Southern District of New York

The following Crisis Management Teams were activated: MDC Brooklyn Planning Section Team (PST); USP Canaan Emergency Preparedness Officer (EPO); FCI Otisville DCT – 19;


**Wednesday, February 6, 2019**

The following Crisis Management Teams were activated: FMC Devens SORT – 16.

**Thursday, February 7, 2019**

The following Crisis Management Teams were activated: MDC Brooklyn Crisis Support Team (CST) – 2; MCC New York CST – 5.

**Friday, February 8, 2019**

The following Crisis Management Teams were activated: FCI Otisville CST – 2; FCI Danbury DCT – 17.

**Monday, February 11, 2019**

6:00 p.m.: Staff begin institution tour:
Doug Collins U.S. Representative, Georgia's 9th District

The following Crisis Management Teams were activated: FDC Philadelphia DCT  - 19; USP Lewisburg EPO.

**Wednesday, February 13, 2019**

The following Crisis Management Teams were activated: FDC Philadelphia EPO; FCC Allenwood EPO.

**Wednesday, February 27, 2019**

Miller-Remick, a structural engineering firm, submits an initial report to the Northeast Regional Office outlining several potential causes of the switchgear malfunction resulting in the fire. Report suggest "incoming feeders were spliced inside the switchboard, presumably when they were first installed", and "feeders were….insufficient length....lengthened via a taped butt splice".

**Friday, March 1, 2019**

2:39 p.m.: NY Post issues article, titled "Inmates Again Without Heat at Brooklyn Detention Center". Article quotes Deirdre Von Dornum, Federal Public Defenders Office, Eastern District of New York, who reported the heat was out again in three units and "there's freezing air coming out of the vents". On March 1, 2019, temperature readings in all units range between 69.6 and 76.8.

**Analysis of Events**:

The After Action Review Team discovered lapses of basic sound correctional practices that diminished the institution's ability to effectively recognize, address, and respond to a potential incident(s) from developing and/or occurring. Additionally, the neglect of major mechanical systems at the MDC was noted as a significant concern by subject matter experts on the review team. Below are the key areas in which the team has based our findings.

*Mechanical Services*

A comprehensive review of the Facilities Department revealed neglect of mechanical components that led to failures and breakdowns in major equipment systems. The AAR team closely reviewed several key areas that contributed to these failures, to include the preventative maintenance program, condition of emergency power generators, proficiency of staff, and the overall condition of the MDC mechanical operations. During the week, the team, through direct observation, determined there was a significant amount of mechanical neglect throughout the building. Through observations and interviews, the AAR Team concluded a lack of simple repairs and major system deficiencies were noted with often no urgency to identify or correct them in a timely fashion. Mechanical rooms and areas in which mechanical systems are located were dirty and not maintained in a high level of sanitation. A lack of these repairs can be directly attributed to staff at MDC Brooklyn not submitting minor work requests prior to these events. Without submission of work request, the institution could not track completed and needed maintenance work.

As noted in the chronological events, priority switch gear #3 began experiencing problems on Friday, January 4, 2019, twenty-three days prior to the fire and subsequent loss of power. Although, it is difficult to identify the root cause of the electrical fire, it is highly probable the switch gear and its two failures before the fire were not properly assessed by staff or outside contractors prior to making repairs on the system.

On Tuesday, January 29, 2019, the Northeast Regional Office hired an architectural and structural engineering firm to assess the damage caused by the fire and provide an analysis as to the probable causes to the switchgear failure. The report identifies an arcing event, which occurred inside the switchboard at the compartment containing

the input feeder cables.  This event expelled enough energy to carbonize the insulation on the cables and adjacent materials and sparked a spontaneous fire.  Both electrical feeders to the panel, commercial and generator power, were damaged by the event.

A review of the report and physical inspection of the switchgear, identified inconsistencies.  Specifically, the report identified that incoming feeder cables had been spliced inside the switchboard, presumably when they were first installed.  The report further states that when the feeder cables were pulled into the switchboard there was insufficient length to terminate them and as a remedy, they were lengthened via a taped butt splice.  An examination of the cabinet and feeder cables did not show any evidence of splicing into the switchgear cabinet.  The damage caused by the fire was catastrophic, resulting in irreparable conditions to the cabinet. Based on this review, and regardless of the availability of emergency power, restoring power to the affected areas was not possible. Replacement parts for the cabinet and switchgear are not standard items BOP institutions maintain, and are not standard items other industrial or commercial buildings maintain as they rarely fail in industry contexts.

The HVAC systems that provide air and heating to the inmate living areas of the MDC are comprised of fifteen multi-staged air handling units configured to introduce air and heat through hot and chilled water coils.  An examination of the systems revealed negligence in maintaining the systems in operating order.  At the time of the review the HVAC systems servicing cells and day rooms of the housing units were in the following condition:

23% (7 of 30) outside air dampers were found to have the motor actuators disabled and/or disconnected.

53% (16 of 30) of the magnehelic (pressure) gauges were out of commission.

100% (30 of 30) of the heating hot water recirculation pumps were not working or had been removed.

3% (1 of 30) of the supply air fans was out of commission.

Overall, the systems were dirty and lacked the presence of regular preventative maintenance.

An assessment of the preventative maintenance program for the HVAC
systems revealed an absence of the following critical inspections
steps to ensure components are operating properly.

    a. Recirculation pumps
    b. Magnehelic Gauge readings
    c. Damper actuators
    d. Damper

Direct observations and interviews revealed an HVAC deficiency in
competency levels for some employees.  The Bureau currently conducts
panel interviews for newly hired employees in trade positions (HVAC,
Electrical, etc.), but not for current BOP employees who apply and
are determined qualified by the reviewing officials.  Several
discussions with staff yielded the absence of basic knowledge of
systems related to their field.  Other observations and interviews
resulted in staff rationalizing the conditions and justifying why
systems were not repaired or maintained in accordance with
manufacturer standards.  Furthermore, during the week of the AAR,
the review team witnessed employees from other institutions at MDC
assisting in repairs.  These employees were working on HVAC
equipment, while MDC staff were noted in their shops/offices.  The
inability to effect any significant improvement in the performance
of the department is directly associated with the culture of the
facility and lack of leadership and direction within the Facilities
Department.

During the review, the facilities department was staffed at 89.2%
with seven vacancies.  These vacancies include two Electronics
Technicians, one Engineering Technician, one Electrical Worker
Foreman, one Maintenance Worker Foreman, one Plumbing Worker
Foreman, and one HVAC Foreman. Since the review, the institution has
hired two Electronics Technicians, one Engineering Technician, one
Maintenance Worker Foreman, and one Plumbing Worker Foreman.
Interviews were held the week of June 12, 2019, for one Electrician
and two additional Maintenance Worker Foreman.  The HVAC Foreman
position has been announced multiple times.  This position was
re-announced and closed June 26, 2019, and includes a 10% relocation
incentive.  Although MDC staff noted the lack of sufficient staffing
as a primary reason for the issues noted above, the AAR team found
the staffing to be adequate to have prevented the neglect that
contributed to the general condition of the building.  Additionally,
a department that is responsible for maintaining three buildings
(East, West and Staff Housing), only employs 23 inmate workers,
compared to the 34 staff.  The amount of inmate workers is

insufficient to accomplish the maintenance of these buildings.  A review of this issue suggested the Unit Team Staff were not assigning or referring inmates to work details within the Facilities Department and Facilities Staff indicated during interviews that did not have the desire or time to supervise inmate work details.

The review team was unable to confirm the MDC conducted an annual building and grounds inspection as no report was produced.  This report is completed annually as a self assessment of all facility structures and systems, to include HVAC. The Facility Manager is responsible to complete this assessment (PS 4200.12, Chapter 5, page 4).  The missing inspection should have identified the issues with the HVAC system and speaks to a broken preventative maintenance program.  The Buildings and Grounds inspection used to be reviewed as part of the Program Review process. It required submission to Regional Office for review and a response was generated to the report. This requirement was removed during the policy update in April 2016.

Funding is an essential requirement in maintaining the facilities departments' mission.  A review of annual funding levels along with requests supplemental funding for projects and emergency repairs, revealed sufficient funding and support from the Regional Office.

The agency utilizes a variety of internal controls to ensure functions of a department are meeting standards based on regulations and policy.  The review team closely examined documents pertaining to Regional Staff Assist Visits, Operations Reviews, and Program Reviews.  Internal reviews were completed as noted below.

Program Review – March 29, 2016
Operational Review – May 1-5, 2017
Operational Review – May 21-25, 2018
Regional Staff Assist Visit – July 30 - August 2, 2018

Based on the teams observations, these did not identify failures in a vital area.  Specifically, the Facilities Management Program Review Guidelines (G4200I.08) dated, 10/27/17, Section (3.1) Preventative Maintenance (PM) Program lists the following.

3.1.1 **(V-3)** Tour the institution(s) and:

a. Make a visual assessment of the physical plant and infrastructure (buildings, mechanical rooms, grounds, tunnels, vaults, roofs, telephone rooms, etc.) and determine if PM and/or corrective maintenance is accomplished.

b. Check the condition of equipment in areas toured to determine if PM has been accomplished and equipment is in good working order.

The internal reviews failed to identify the negligence pertaining to the HVAC system and failures to conduct repairs to essential components.  Documents and interviews reflect a majority of the issues identified in the previous section are long standing issues.  Interviews with facilities management staff indicated that several of the inoperable components on the HVAC system have been disconnected and/or removed for several years and should have been reflected in the internal audits identified above.

*Communication with the media and external stakeholders*

Effective communications during a critical incident is essential in maintaining a quick resolution to crisis events.  The review team closely examined several key areas of communication that contributed to the stakeholder and community activists' responses to this incident.  These areas include staff briefings, inmate communications, responsiveness to media requests, and maintaining open lines of communications with the courts, law enforcement agencies, U.S. Attorney's Offices, Federal Public Defenders, and private attorneys.

Staff and inmates were provided with limited information regarding the status of repairs and current operations of the facility.  There were three documented staff conference calls (2/2, 2/4, 2/5) and one staff briefing.  The team was able to discover one written bulletin to the population but were unable to confirm the information was effectively communicated with all inmates at the MDC.  Interviews with staff revealed complaints that little to no information was disseminated to them on a daily basis regarding active threats to staff safety and intelligence regarding protesters.  Ensuring staff are provided up to date information during a crisis situation is paramount in coordinating resources and accomplishing tasks related to a successful resolution.

Throughout this incident the BOP received a total of 128 media inquiries.  Nineteen were direct inquiries to the institution from media outlets, requesting information pertaining to the partial loss of power and reported heating outage.  A close examination revealed some responses in providing current information were not done in a

timely matter.  The average response time to these inquiries was calculated at 16.2 hours before a response was returned to the sender. In the current environment of technology and social media, the lack of quick response to inquiries only hinders the agency in deescalating situations, distracts from providing a transparent environment, and leads to increased levels of inaccurate information being shared by other sources.  The current practice of the Bureau of Prisons is to have Regional and Central Office review all media inquiries prior to issuance to requesting media outlets.

Maintaining open lines of communications with our federal partners is critical in accomplishing the mission at the MDC.  Interviews with members of the courts, law enforcement agencies, U.S. Attorney's Offices, Federal Public Defenders and private attorneys, revealed a failure in providing information regarding the MDC's mechanical issues and status of repairs.

Many of these entities provided favorable comments regarding the working relationship with the MDC but indicated that they were not kept informed throughout the incident.  These individuals relayed the lack of transparency resulted in significant delays in court proceedings, scheduling conflicts, and having to dedicate additional resources to respond to inquiries and complaints.  Overall, they indicated that the manner in which the MDC handled this incident demonstrated a lack of transparency, communication, and some questioned the truthfulness of the information being provided.

The MDC does not have an updated media plan that outlines national policy requirements.  The lack of a comprehensive plan only distracts from the MDC's ability to disseminate critical information in an emergency situation.  Furthermore, the MDC did not have readily available contact information for all essential agencies.  The absence of establishing good communications directly impacted the institution's ability to accomplish the mission during this incident and resulted in inaccurate or exaggerated reports being spread in community and social media forums.

## *Legal Services*

Following interviews and observations, the review team found an overall lack of effective communication, which adversely effected the MDC's ability to provide timely, accurate information to the courts, Federal Public Defenders Office, and private attorneys.  The institution's Executive Staff and Legal Department failed to share

information with each other on a daily basis, resulting limited information sharing with our federal partners.  The lack of trust between the Legal Department and inmate's attorneys was noted as problematic and compounded information sharing and general communication problems that resulted in inaccurate or exaggerated reports being relayed into the community. This conclusion was based on interviews and feedback from both BOP attorneys and Federal Public Defender Attorneys.

Throughout the incident, legal visits were cancelled and/or significantly curtailed based on the lack of power to the visiting room.  The review team estimates that approximately thirty attorney visits occur daily and each attorney schedules multiple client meetings.  This function of the MDC is essential in accomplishing the mission of the courts.  The institution took additional measures to place emergency lighting in several areas of the building, but failed to recognize the significance of restoring attorney-client visiting as soon as possible.  The MDC should have utilized the visiting room in the east building by providing security escorts and temporary lighting in the walkway between both buildings.

The ability for inmates to place legal calls was reviewed, and determined not to pose a significant concern.  Inmates were able to utilize the direct phone station in each housing unit to communicate with the Federal Public Defenders Office.  However, the review team was unable to verify inmates who are not represented by the Federal Public Defenders Office had adequate access to legal calls. Nevertheless, access to legal calls was not noted as a concern during interviews with inmates.

During a comprehensive meeting with the Federal Public Defender, a number of concerns were discussed regarding the relationship between agencies.  An overall lack of faith was expressed regarding issues pertaining to medical treatment, legal visits, wait times, communications, professionalism of staff, responsiveness to issues, and the lack of heating and lighting at the MDC.  An overall concern was the long standing culture of the MDC and its inability to serve the Eastern and Southern Districts in accomplishing the mission of the courts. It was relayed that attorneys do not complain about problems at the institution because they fear retaliation towards their clients.  Examples given included such actions as leaving attorneys waiting in the lobby for extended periods of time and locking attorney rooms with the lights off and indicating the lights don't work, making them unavailable.

Direct observations by the review team revealed an ineffective method to process visitors into the institution and confirmed that wait times were sometimes unnecessary.  Additionally, a review of the visiting room during legal visits also confirmed the lack of responsiveness on behalf of staff pertaining to issues raised by attorneys.

Lastly, the BOP Legal Services Department did not receive timely responses to its repeated inquires to the Executive Staff.  Legal Services was not privy to the steps being taken to resolve the incident and several questions went unanswered.  Internal cooperation and communications failed to ensure all parties were circulating accurate information to resolve the incident.


*Medical and Mental Health Treatment*

The Health Services Unit (HSU) is staffed at 76% with three newly hired BOP staff physicians, five Advanced Practice Providers (APPs), and six registered nurses (RNs).  Team medicine is implemented with the APPs assigned to specific floors to provide medical services. During the electrical power outage on January 27, 2019, the HSU remained operational with the provision of sick call triage, chronic care clinics, emergency services, and medication administration. The facility conducts two pill lines on each floor at 6:00 a.m., 2:00 p.m., Monday -Friday, and 7:00 a.m., and 4:00 p.m. on Saturdays and Sundays.

Sick call triage is conducted electronically through the Trust Fund Limited Inmate Computer System (TRULINCS).  Inmates submit requests by email to staff BRO/Inmatetosickcall (Medical) or BRO/Inmatetodental (Dental) mailboxes.  During the electrical outage, inmates had to submit sick call and medication refill requests via paper to the medical staff.  The medical staff were able to triage medical services based on medical acuity.  Medication refills were processed by paper requests or by submitting empty medication bottles to the medical staff.

During the review, it was noted that the electronic sick call process as performed, may not always meet the requirements of the Patient Care Program Statement 6031.04 and lacks the appropriate ongoing oversight for triage purposes.  For example, clinically indicated vital signs may not have been taken for an individual with a poor clinical presentation.  This is because the request was not reviewed and appropriately assigned to a clinical provider to make a

determination regarding the clinical necessity for vital signs to be obtained.

The APPs and nurses are both reviewing and scheduling sick call appointments.  A review of 219 sick call requests between February 8-12, 2019, revealed three requests had been opened by medical staff.  The sample review may be a reflection of lack of oversight of the sick call electronic mailbox.

During the limited electrical outage, Health Services Unit identified 14 inmates diagnosed with sleep apnea requiring electrical outlets for the CPAP machine.  Due to the electrical outage it was recommended to transfer the inmates with CPAP machines to the East building.  The inmates were transferred to the East building on January 31, 2019, five days after the loss of power.  There were three inmates out of the fourteen who declined to move and remained in the West building.  Based on their medical condition, it would have been prudent to move them and not given the option to remain in their current housing unit.

Interviews with a staff psychologists revealed increased clinical intervention in February with 162 visits compared to January with 74 visits.  Psychologists or the contract psychiatrists addressed mental health concerns voiced by the inmate population during the incident and provided comprehensive and adequate mental health treatment without any concerns noted during the review.

Twenty-eight patients voiced medical and psychiatric complaints during the Federal Public Defenders visit on Friday, February 1, 2019.  Electronic health record reviews were conducted on patients with medical complaints identified during the visit and the clinical outcomes were all properly documented.  The Bureau Electronic Medical Records (BEMR) review revealed two inmates with court-ordered emergency treatment.  Both were provided medical treatment and returned from the community hospital to the facility within 24 hours. In addition, four patients with medical complaints were transported to the community hospital to receive medical care.  The majority of the patients with medical complaints were classified as care level one or care level two with only one patient with multiple uncontrolled co-morbidities classified as care level 3.

Medical staff were responsive to the medical needs of the patient population during the incident and referred those patients to the community hospital who required urgent and emergency care. The medical staff addressed all of the patient's medical complaints

voiced during the FPD visit by Thursday, February 7, 2019. During the FPD visit, general concerns expressed pertained to the inmate's inability to make requests for medical service and/or medication refills through the Trust Fund Limited Inmate Computer System (TRULINCS) during the electrical outage. The Health Services Administrator stated the inmates were instructed to access medical services by submitting a written request to health services for evaluation or medication refills as described in the *Inmate Admission and Orientation Handbook*. In addition, he conveyed the patients were able to submit empty medication bottles to medical staff for medication refills.  Pill line administration of medications on each unit continued uninterrupted during the power outage

*Emergency Response*

Based on the external threat to the institution and growing crowds of protesters, the institution activated several emergency response protocols to address the potential threats to staff and institution safety and security.  Temporary modifications were made by installing cyclone fencing in front of the facility to prevent direct access by protesters.  Additionally, Crisis Management Teams (CMT) from nine institutions, totaling ninety-five staff, were deployed to the MDC throughout the incident.

The review team revealed multiple lapses in policy and procedures, related to training, equipment, documentation of activities, that diminished the institution's ability to avoid the incident in the lobby on Sunday, February 3, 2019.  Staff failed to anticipate the potential conflict and did not secure the main egress to the facility. CMT teams were activated and on standby but staff were not wearing required gear.  Several CMT members lack the mandatory training requirements and contingency plans have not been reviewed by all full time employees.  In addition, the Command Center was not established in a timely matter and initially only maintained limited documentation of the activities in and surrounding the institution.

When questioned, staff were not proficient in the Use of Force policy and arrest authority.  Executive leadership in the institution were not aware of the exclusive jurisdiction of MDC and the institution's ultimate responsibility for law enforcement functions on government property.  Historically, the New York Police Department (NYPD) had effectuated arrests of visitors at the MDC for a variety of offenses. Once it determined the MDC is under exclusive federal jurisdiction, the NYPD gave orders to not access MDC property to effectuate arrests.

An assessment of the MDC and its external gates, doors, and egresses revealed several deficiencies.  The front lobby doors have not been properly secure for several months.  The vehicle gate was damaged and had been neglected until this emergency.  The roll-up vehicle gate that accesses the trash compactor area has not been repaired for over a year.  Based on interviews, observations, and documentation, the overall condition of the security features surrounding the facility are poor and require extensive repairs.

Maintaining accurate and comprehensive incident documentation is essential in an emergency.  The institution initially struggled to compile data related to Planning Section duties.  An experienced CMT member from another institution was deployed to the MDC to assist in implementing the Incident Command System.  The institution has four members assigned to the Planning Section Team and not all members have completed the required ICS training and quarterly team training.

During the fire on Sunday, January 27, 2019, responding staff accessed and deployed the Self Contained Breathing Apparatus (SCBA) to enter the 2nd mechanical room.  Five staff were identified as utilizing the equipment and none of the staff were fit tested and one of five never received any SCBA certification training.  A review of the SCBA storage locations revealed several units missing and unaccounted for.


*Search Procedures*

During the incident inmates were broadcasting information from contraband cell phones to several social media sites.  Information provided by institution staff revealed that a total of fifteen contraband cell phones had been discovered in a 90 day time frame within the secure confines of the MDC.  An assessment and observation of the front lobby and rear gate revealed disregard for security procedures.  During the review week, MDC staff failed to properly search, identify, and document the team as they entered the facility. Adequate searches were not conducted at the rear gate.  The configuration of the front lobby is ineffective and allows for staff and visitors to circumvent comprehensive search procedures.

*Mutual Agreements*

The institution does not have mutual agreements with other agencies
to assist in emergency situations.  Collaborative relationships
must be established to discuss and plan for emergencies and what
resources agencies are willing to provide in crisis situations.


**CONCLUSIONS:**

Based on the review, the team finds that while the cause of the fire
and loss of power to the MDC is currently under review, the actions,
decisions, and management of the maintenance of the building was
noted as problematic.  The condition of the MDC is poor and requires
extensive preventative maintenance to restore these mechanical
systems.  Additionally, many of the findings by the team were
associated with the failure to effectively communicate with staff,
inmates, external stakeholders, and the courts surrounding the
events at the MDC.  Public perception into the loss of electricity
and heat was not adequately addressed to avoid a civil disturbance
at the institution.  Heating issues related to areas of the building
that house inmates was corrected prior to the power outage, however,
public perception fueled by lack of transparency outweighed the
facts.  In addition, staff were not appropriately prepared to
respond to the civil disturbance emergency that occurred.


**RECOMMENDATIONS:**





**Inmate Data**: Not Applicable

**Cost/Impact Statement**:

Incident Site: MDC Brooklyn

Incident: Electrical and Heating Outage / Civil Disturbance

Incident Date: 1/24/19 to 2/3/19

| Description | Cost |
|---|---|
| Emergency Generator Installation<br>Rental Equipment for Generators<br>Switch Gear Repairs<br>Repair of MDC Generators<br>Cables for Temp Generator<br>Restoration of Power | $138,265.17 |
| Replace/Repair broken HVAC coils | $30,125.61 |
| HVAC System parts | $57,891.12 |
| Fire Alarm System Repairs | $9,219.53 |
| Temporary Fence | $3,492.00 |
| Overtime | $330,985.46 |
| Miller-Remick Report | $437,388.55 |
| TDY – Emergency Response Teams | $388,380.00 |
| TDY – Mechanical Services | $185,690.37 |
| **TOTAL** | **$1,581,437.81** |